# DELAWARE *v.* PROUSE

No. 77–1571.  Argued January 17, 1979—Decided March 27, 1979

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. BLACKMUN, J., filed a concurring opinion, in which POWELL, J., joined, *post,* p. 663. REHNQUIST, J., filed a dissenting opinion, *post,* p. 664.

*Charles M. Oberly III* argued the cause for petitioner. With him on the brief were *Richard R. Wier, Jr.,* Attorney General of Delaware, and *Carolyn Berger, Fred S. Silverman,* and *Kathleen Molyneux,* Deputy Attorneys General.

*David M. Lukoff* argued the cause for respondent. With him on the brief were *Richard M. Baumeister, Frank Askin,* and *Eric Neisser.**

*Frank Carrington, Wayne W. Schmidt, Glen R. Murphy,* and *James P. Costello* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging reversal.

MR. JUSTICE WHITE delivered the opinion of the Court.

The question is whether it is an unreasonable seizure under the Fourth and Fourteenth Amendments to stop an automobile, being driven on a public highway, for the purpose of checking the driving license of the operator and the registration of the car, where there is neither probable cause to believe nor reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable law.

I

At 7:20 p. m. on November 30, 1976, a New Castle County, Del., patrolman in a police cruiser stopped the automobile occupied by respondent.[1] The patrolman smelled marihuana smoke as he was walking toward the stopped vehicle, and he seized marihuana in plain view on the car floor. Respondent was subsequently indicted for illegal possession of a controlled substance. At a hearing on respondent's motion to suppress the marihuana seized as a result of the stop, the patrolman testified that prior to stopping the vehicle he had observed neither traffic or equipment violations nor any suspicious activity, and that he made the stop only in order to check the driver's license and registration. The patrolman was not acting pursuant to any standards, guidelines, or procedures pertaining to document spot checks, promulgated by either his department or the State Attorney General. Characterizing the stop as "routine," the patrolman explained, "I saw the car

---

[1] In its opinion, the Delaware Supreme Court referred to respondent as the operator of the vehicle, see 382 A. 2d 1359, 1361 (1978). However, the arresting officer testified: "I don't believe [respondent] was the driver. . . . As I recall, he was in the back seat . . . ," App. A12; and the trial court in its ruling on the motion to suppress referred to respondent as one of the four "occupants" of the vehicle, id., at A17. The vehicle was registered to respondent. Id., at A10.

in the area and wasn't answering any complaints, so I decided to pull them off." App. A9. The trial court granted the motion to suppress, finding the stop and detention to have been wholly capricious and therefore violative of the Fourth Amendment.

The Delaware Supreme Court affirmed, noting first that "[t]he issue of the legal validity of systematic, roadblock-type stops of a number of vehicles for license and vehicle registration check is *not* now before the Court," 382 A. 2d 1359, 1362 (1978) (emphasis in original). The court held that "a random stop of a motorist in the absence of specific articulable facts which justify the stop by indicating a reasonable suspicion that a violation of the law has occurred is constitutionally impermissible and violative of the Fourth and Fourteenth Amendments to the United States Constitution." *Id.,* at 1364. We granted certiorari to resolve the conflict between this decision, which is in accord with decisions in five other jurisdictions,[2] and the contrary determination in six jurisdictions[3] that the Fourth Amendment does not prohibit the kind of automobile stop that occurred here. 439 U. S. 816 (1978).

## II

Because the Delaware Supreme Court held that the stop at issue not only violated the Federal Constitution but also

---

[2] *United States* v. *Montgomery,* 182 U. S. App. D. C. 426, 561 F. 2d 875 (1977); *People* v. *Ingle,* 36 N. Y. 2d 413, 330 N. E. 2d 39 (1975); *State* v. *Ochoa,* 23 Ariz. App. 510, 534 P. 2d 441 (1975), rev'd on other grounds, 112 Ariz. 582, 544 P. 2d 1097 (1976); *Commonwealth* v. *Swanger,* 453 Pa. 107, 307 A. 2d 875 (1973); *United States* v. *Nicholas,* 448 F. 2d 622 (CA8 1971). See also *United States* v. *Cupps,* 503 F. 2d 277 (CA6 1974).

[3] *State* v. *Holmberg,* 194 Neb. 337, 231 N. W. 2d 672 (1975); *State* v. *Allen,* 282 N. C. 503, 194 S. E. 2d 9 (1973); *Palmore* v. *United States,* 290 A. 2d 573 (D. C. App. 1972), aff'd on jurisdictional grounds only, 411 U. S. 389 (1973); *Leonard* v. *State,* 496 S. W. 2d 576 (Tex. Crim. App. 1973); *United States* v. *Jenkins,* 528 F. 2d 713 (CA10 1975); *Myricks* v. *United States,* 370 F. 2d 901 (CA5), cert. dismissed, 386 U. S. 1015 (1967).

was impermissible under Art. I, § 6, of the Delaware Constitution, it is urged that the judgment below was based on an independent and adequate state ground and that we therefore have no jurisdiction in this case. *Fox Film Corp.* v. *Muller,* 296 U. S. 207, 210 (1935). At least, it is suggested, the matter is sufficiently uncertain that we should remand for clarification as to the ground upon which the judgment rested. *California* v. *Krivda,* 409 U. S. 33, 35 (1972). Based on our reading of the opinion, however, we are satisfied that even if the State Constitution would have provided an adequate basis for the judgment, the Delaware Supreme Court did not intend to rest its decision independently on the State Constitution and that we have jurisdiction of this case.

As we understand the opinion below, Art I, § 6, of the Delaware Constitution will automatically be interpreted at least as broadly as the Fourth Amendment;[4] that is, every police practice authoritatively determined to be contrary to the Fourth and Fourteenth Amendments will, without further analysis, be held to be contrary to Art. I, § 6. This approach, which is consistent with previous opinions of the Delaware Supreme Court,[5] was followed in this case. The court ana-

---

[4] The court stated:

"The Delaware Constitution Article I, § 6 is substantially similar to the Fourth Amendment and a violation of the latter is necessarily a violation of the former." 382 A. 2d, at 1362, citing *State* v. *Moore,* 55 Del. 356, 187 A. 2d 807 (1963).

*Moore* was decided less than two years after *Mapp* v. *Ohio,* 367 U. S. 643 (1961), applied to the States the limitations previously imposed only on the Federal Government. In setting forth the approach reiterated in the opinion below, *Moore* noted not only the common purposes and wording of the Fourth Amendment and the state constitutional provision, but also the overriding effect of the former. See 55 Del., at 362–363, 187 A. 2d, at 810–811.

[5] We have found only one case decided after *State* v. *Moore, supra,* in which the court relied solely on state law in upholding the validity of a search or seizure, and that case involved not only Del. Const. Art. I, § 6,

lyzed the various decisions interpreting the Federal Constitution, concluded that the Fourth Amendment foreclosed spot checks of automobiles, and summarily held that the State Constitution was therefore also infringed. This is one of those cases where "at the very least, the [state] court felt compelled by what it understood to be federal constitutional considerations to construe . . . its own law in the manner it did." *Zacchini* v. *Scripps-Howard Broadcasting Co.*, 433 U. S. 562, 568 (1977). Had state law not been mentioned at all, there would be no question about our jurisdiction, even though the State Constitution might have provided an independent and adequate state ground. *Ibid.* The same result should follow here where the state constitutional holding depended upon the state court's view of the reach of the Fourth and Fourteenth Amendments. If the state court misapprehended federal law, "[i]t should be freed to decide . . . these suits according to its own local law." *Missouri ex rel. Southern R. Co.* v. *Mayfield*, 340 U. S. 1, 5 (1950).

## III

The Fourth and Fourteenth Amendments are implicated in this case because stopping an automobile and detaining its occupants constitute a "seizure" within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention quite brief. *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 556–558 (1976); *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 878 (1975); cf. *Terry* v. *Ohio*, 392 U. S. 1, 16 (1968). The essential purpose of the proscriptions in the Fourth Amendment is to impose a stand-

---

but also state statutory requirements for issuance of a search warrant. *Rossitto* v. *State*, 234 A. 2d 438 (1967). Moreover, every case holding a search or seizure to be contrary to the state constitutional provision relies on cases interpreting the Fourth Amendment and simultaneously concludes that the search or seizure is contrary to that provision. See, *e. g.*, *Young* v. *State*, 339 A. 2d 723 (1975); *Freeman* v. *State*, 317 A. 2d 540 (1974); cf. *Bertomeu* v. *State*, 310 A. 2d 865 (1973).

ard of "reasonableness" [6] upon the exercise of discretion by government officials, including law enforcement agents, in order " 'to safeguard the privacy and security of individuals against arbitrary invasions. . . .' " *Marshall* v. *Barlow's, Inc.,* 436 U. S. 307, 312 (1978), quoting *Camara* v. *Municipal Court,* 387 U. S. 523, 528 (1967).[7] Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.[8] Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against "an objective standard," [9] whether this be probable cause [10] or a less stringent test.[11] In those situations in which the balance of interests precludes insistence upon "some quantum

---

[6] See *Marshall* v. *Barlow's, Inc.,* 436 U. S. 307, 315 (1978); *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 878 (1975); *Cady* v. *Dombrowski,* 413 U. S. 433, 439 (1973); *Terry* v. *Ohio,* 392 U. S. 1, 20–21 (1968); *Camara* v. *Municipal Court,* 387 U. S. 523, 539 (1967).

[7] See also *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 554 (1976); *United States* v. *Ortiz,* 422 U. S. 891, 895 (1975); *Almeida-Sanchez* v. *United States,* 413 U. S. 266, 270 (1973); *Beck* v. *Ohio,* 379 U. S. 89, 97 (1964); *McDonald* v. *United States,* 335 U. S. 451, 455–456 (1948).

[8] See, *e. g., United States* v. *Ramsey,* 431 U. S. 606, 616–619 (1977); *United States* v. *Martinez-Fuerte, supra,* at 555; cases cited in n. 6, *supra.*

[9] *Terry* v. *Ohio, supra,* at 21. See also *Scott* v. *United States,* 436 U. S. 128, 137 (1978); *Beck* v. *Ohio, supra,* at 96–97.

[10] See, *e. g., United States* v. *Santana,* 427 U. S. 38 (1976); *United States* v. *Watson,* 423 U. S. 411 (1976); *Ker* v. *California,* 374 U. S. 23 (1963) (warrantless arrests requiring probable cause); *United States* v. *Ortiz, supra; Warden* v. *Hayden,* 387 U. S. 294 (1967); *Carroll* v. *United States,* 267 U. S. 132 (1925) (warrantless searches requiring probable cause). See also *Gerstein* v. *Pugh,* 420 U. S. 103 (1975).

[11] See *Terry* v. *Ohio, supra; United States* v. *Brignoni-Ponce, supra.*

In addition, the Warrant Clause of the Fourth Amendment generally requires that prior to a search a neutral and detached magistrate ascertain that the requisite standard is met, see, *e. g., Mincey* v. *Arizona,* 437 U. S. 385 (1978).

of individualized suspicion," [12] other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not "subject to the discretion of the official in the field," *Camara* v. *Municipal Court,* 387 U. S., at 532. See *id.,* at 534–535; *Marshall* v. *Barlow's, Inc., supra,* at 320–321; *United States* v. *United States District Court,* 407 U. S. 297, 322–323 (1972) (requiring warrants).

In this case, however, the State of Delaware urges that patrol officers be subject to no constraints in deciding which automobiles shall be stopped for a license and registration check because the State's interest in discretionary spot checks as a means of ensuring the safety of its roadways outweighs the resulting intrusion on the privacy and security of the persons detained.

## IV

We have only recently considered the legality of investigative stops of automobiles where the officers making the stop have neither probable cause to believe nor reasonable suspicion that either the automobile or its occupants are subject to seizure under the applicable criminal laws. In *United States* v. *Brignoni-Ponce, supra,* Border Patrol agents conducting roving patrols in areas near the international border asserted statutory authority to stop at random any vehicle in order to determine whether it contained illegal aliens or was involved in smuggling operations. The practice was held to violate the Fourth Amendment, but the Court did not invalidate all warrantless automobile stops upon less than probable cause. Given "the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border," 422 U. S., at 881, the Court analogized the roving-patrol stop to the on-the-street encounter addressed in *Terry* v. *Ohio, supra,* and held:

"Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are

---

[12] *United States* v. *Martinez-Fuerte, supra,* at 560.

aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." 422 U. S., at 884 (footnote omitted).

Because "the nature of illegal alien traffic and the characteristics of smuggling operations tend to generate articulable grounds for identifying violators," *id.,* at 883, "a requirement of reasonable suspicion for stops allows the Government adequate means of guarding the public interest and also protects residents of the border areas from indiscriminate official interference." *Ibid.*

The constitutionality of stops by Border Patrol agents was again before the Court in *United States* v. *Martinez-Fuerte, supra,* in which we addressed the permissibility of checkpoint operations. This practice involved slowing all oncoming traffic "to a virtual, if not a complete, halt," 428 U. S., at 546, at a highway roadblock, and referring vehicles chosen at the discretion of Border Patrol agents to an area for secondary inspection. See *id.,* at 546, 558. Recognizing that the governmental interest involved was the same as that furthered by roving-patrol stops, the Court nonetheless sustained the constitutionality of the Border Patrol's checkpoint operations. The crucial distinction was the lesser intrusion upon the motorist's Fourth Amendment interests:

"[The] objective intrusion—the stop itself, the questioning, and the visual inspection—also existed in roving-patrol stops. But we view checkpoint stops in a different light because the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop." *Id.,* at 558.

Although not dispositive,[13] these decisions undoubtedly pro-

---

[13] In addressing the constitutionality of Border Patrol practices, we reserved the question of the permissibility of state and local officials stopping

vide guidance in balancing the public interest against the individual's Fourth Amendment interests implicated by the practice of spot checks such as occurred in this case. We cannot agree that stopping or detaining a vehicle on an ordinary city street is less intrusive than a roving-patrol stop on a major highway and that it bears greater resemblance to a permissible stop and secondary detention at a checkpoint near the border. In this regard, we note that *Brignoni-Ponce* was not limited to roving-patrol stops on limited-access roads, but applied to any roving-patrol stop by Border Patrol agents on any type of roadway on less than reasonable suspicion. See 422 U. S., at 882–883; *United States* v. *Ortiz,* 422 U. S. 891, 894 (1975). We cannot assume that the physical and psychological intrusion visited upon the occupants of a vehicle by a random stop to check documents is of any less moment than that occasioned by a stop by border agents on roving patrol. Both of these stops generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority. Both interfere with freedom of movement, are inconvenient, and consume time. Both may create substantial anxiety. For Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random stops of individual vehicles making their way through city traffic and those stops occasioned by roadblocks where all vehicles are brought to a halt or to a near halt, and all are subjected to a show of the police power of the community. "At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." *Id.,* at 894–895, quoted in *United States* v. *Martinez-Fuerte,* 428 U. S., at 558.

---

motorists for document questioning in a manner similar to checkpoint detention, see 428 U. S., at 560 n. 14, or roving-patrol operations, see *United States* v. *Brignoni-Ponce,* 422 U. S., at 883 n. 8.

## V

But the State of Delaware urges that even if discretionary spot checks such as occurred in this case intrude upon motorists as much as or more than do the roving patrols held impermissible in *Brignoni-Ponce,* these stops are reasonable under the Fourth Amendment because the State's interest in the practice as a means of promoting public safety upon its roads more than outweighs the intrusion entailed. Although the record discloses no statistics concerning the extent of the problem of lack of highway safety, in Delaware or in the Nation as a whole, we are aware of the danger to life [14] and property posed by vehicular traffic and of the difficulties that even a cautious and an experienced driver may encounter. We agree that the States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed. Automobile licenses are issued periodically to evidence that the drivers holding them are sufficiently familiar with the rules of the road and are physically qualified to operate a motor vehicle.[15] The registration requirement and, more pointedly, the related annual inspection requirement in Delaware [16] are designed to keep dangerous automobiles off the road. Unquestionably, these provisions, properly administered, are essential elements in a highway safety program. Furthermore, we note that the State of Delaware requires a minimum amount of insurance

---

[14] In 1977, 47,671 persons died in motor vehicle accidents in this country. U. S. Dept. of Transportation, Highway Safety A–9 (1977).

[15] See, *e. g.,* Del. Code Ann., Tit. 21, §§ 2701, 2707 (1974 and Supp. 1977); § 2713 (1974) (Department of Public Safety "shall examine the applicant as to his physical and mental qualifications to operate a motor vehicle in such manner as not to jeopardize the safety of persons or property . . .").

[16] § 2143 (a) (1974).

coverage as a condition to automobile registration,[17] implementing its legitimate interest in seeing to it that its citizens have protection when involved in a motor vehicle accident.[18]

The question remains, however, whether in the service of these important ends the discretionary spot check is a sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests which such stops entail. On the record before us, that question must be answered in the negative. Given the alternative mechanisms available, both those in use and those that might be adopted, we are unconvinced that the incremental contribution to highway safety of the random spot check justifies the practice under the Fourth Amendment.

The foremost method of enforcing traffic and vehicle safety regulations, it must be recalled, is acting upon observed violations. Vehicle stops for traffic violations occur countless times each day; and on these occasions, licenses and registration papers are subject to inspection and drivers without them will be ascertained. Furthermore, drivers without licenses are presumably the less safe drivers whose propensities may well exhibit themselves.[19] Absent some empirical data to the contrary, it must be assumed that finding an unlicensed driver among those who commit traffic violations is a much more likely event than finding an unlicensed driver by choosing randomly from the entire universe of drivers. If this were not so, licensing of drivers would hardly be an effective means of promoting roadway safety. It seems common sense that the

---

[17] § 2118 (Supp. 1977); State of Delaware, Department of Public Safety, Division of Motor Vehicles, Driver's Manual 60 (1976).

[18] It has been urged that additional state interests are the apprehension of stolen motor vehicles and of drivers under the influence of alcohol or narcotics. The latter interest is subsumed by the interest in roadway safety, as may be the former interest to some extent. The remaining governmental interest in controlling automobile thefts is not distinguishable from the general interest in crime control.

[19] Cf. *United States* v. *Brignoni-Ponce, supra,* at 883.

percentage of all drivers on the road who are driving without a license is very small and that the number of licensed drivers who will be stopped in order to find one unlicensed operator will be large indeed. The contribution to highway safety made by discretionary stops selected from among drivers generally will therefore be marginal at best. Furthermore, and again absent something more than mere assertion to the contrary, we find it difficult to believe that the unlicensed driver would not be deterred by the possibility of being involved in a traffic violation or having some other experience calling for proof of his entitlement to drive but that he would be deterred by the possibility that he would be one of those chosen for a spot check. In terms of actually discovering unlicensed drivers or deterring them from driving, the spot check does not appear sufficiently productive to qualify as a reasonable law enforcement practce under the Fourth Amendment.

Much the same can be said about the safety aspects of automobiles as distinguished from drivers. Many violations of minimum vehicle-safety requirements are observable, and something can be done about them by the observing officer, directly and immediately. Furthermore, in Delaware, as elsewhere, vehicles must carry and display current license plates,[20] which themselves evidence that the vehicle is properly registered;[21] and, under Delaware law, to qualify for annual registration a vehicle must pass the annual safety inspection[22] and be properly insured.[23] It does not appear, therefore, that a stop of a Delaware-registered vehicle is necessary in order to ascertain compliance with the State's registration requirements; and, because there is nothing to

---

[20] Del. Code Ann., Tit. 21, § 2126 (1974).

[21] §§ 2121 (b), (d) (1974).

[22] See n. 16, *supra*; § 2109 (1974).

[23] See n. 17, *supra;* § 2109 (1974).

show that a significant percentage of automobiles from other States do not also require license plates indicating current registration, there is no basis for concluding that stopping even out-of-state cars for document checks substantially promotes the State's interest.

The marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure—limited in magnitude compared to other intrusions but nonetheless constitutionally cognizable—at the unbridled discretion of law enforcement officials. To insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion "would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches . . . ." *Terry* v. *Ohio,* 392 U. S., at 22. By hypothesis, stopping apparently safe drivers is necessary only because the danger presented by some drivers is not observable at the time of the stop. When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations[24]—or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered—we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver. This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent. *Almeida-Sanchez* v. *United States,* 413 U. S. 266, 270 (1973); *Camara* v. *Municipal Court,* 387 U. S., at 532–533.

---

[24] See, *e. g.,* §§ 4101–4199B (1974 and Supp. 1977).

## VI

The "grave danger" of abuse of discretion, *United States* v. *Martinez-Fuerte,* 428 U. S., at 559, does not disappear simply because the automobile is subject to state regulation resulting in numerous instances of police-citizen contact, *Cady* v. *Dombrowski,* 413 U. S. 433, 441 (1973). Only last Term we pointed out that "if the government intrudes . . . the privacy interest suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards." *Marshall* v. *Barlow's, Inc.,* 436 U. S., at 312–313. There are certain "relatively unique circumstances," *id.,* at 313, in which consent to regulatory restrictions is presumptively concurrent with participation in the regulated enterprise. See *United States* v. *Biswell,* 406 U. S. 311 (1972) (federal regulation of firearms); *Colonnade Catering Corp.* v. *United States,* 397 U. S. 72 (1970) (federal regulation of liquor). Otherwise, regulatory inspections unaccompanied by any quantum of individualized, articulable suspicion must be undertaken pursuant to previously specified "neutral criteria." *Marshall* v. *Barlow's, Inc., supra,* at 323.

An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation.[25] Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the

---

[25] Cf. *Marshall* v. *Barlow's, Inc.,* 436 U. S. 307 (1978) (warrant required for federal inspection under interstate commerce power of health and safety of workplace); *See* v. *Seattle,* 387 U. S. 541 (1967) (warrant required for inspection of warehouse for municipal fire code violations); *Camara* v. *Municipal Court,* 387 U. S. 523 (1967) (warrant required for inspection of residence for municipal fire code violations).

individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As *Terry* v. *Ohio, supra,* recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles. See *Adams* v. *Williams,* 407 U. S. 143, 146 (1972).

## VII

Accordingly, we hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment. This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion.[26] Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers. The judgment below is affirmed.

*So ordered.*

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE POWELL joins, concurring.

The Court, *ante,* this page, carefully protects from the reach of its decision other less intrusive spot checks "that do not in-

---

[26] Nor does our holding today cast doubt on the permissibility of roadside truck weigh-stations and inspection checkpoints, at which some vehicles may be subject to further detention for safety and regulatory inspection than are others.

volve the unconstrained exercise of discretion." The road-
block stop for all traffic is given as an example. I necessarily
assume that the Court's reservation also includes other not
purely random stops (such as every 10th car to pass a given
point) that equate with, but are less intrusive than, a 100%
roadblock stop. And I would not regard the present case as a
precedent that throws any constitutional shadow upon the nec-
essarily somewhat individualized and perhaps largely random
examinations by game wardens in the performance of their
duties. In a situation of that type, it seems to me, the Court's
balancing process, and the value factors under consideration,
would be quite different.

With this understanding, I join the Court's opinion and its
judgment.

MR. JUSTICE REHNQUIST, dissenting.

The Court holds, in successive sentences, that absent an
articulable, reasonable suspicion of unlawful conduct, a
motorist may not be subjected to a random license check, but
that the States are free to develop "methods for spot checks
that . . . do not involve the unconstrained exercise of discre-
tion," such as "[q]uestioning . . . all oncoming traffic at road-
block-type stops . . . ." *Ante*, at 663. Because motorists,
apparently like sheep, are much less likely to be "frightened"
or "annoyed" when stopped en masse, a highway patrolman
needs neither probable cause nor articulable suspicion to stop
*all* motorists on a particular thoroughfare, but he cannot with-
out articulable suspicion stop *less* than all motorists. The
Court thus elevates the adage "misery loves company" to a
novel role in Fourth Amendment jurisprudence. The rule
becomes "curiouser and curiouser" as one attempts to follow
the Court's explanation for it.

As the Court correctly points out, people are not shorn of
their Fourth Amendment protection when they step from their
homes onto the public sidewalks or from the sidewalks into

their automobiles. But a random license check of a motorist operating a vehicle on highways owned and maintained by the State is quite different from a random stop designed to uncover violations of laws that have nothing to do with motor vehicles.* No one questions that the State may require the licensing of those who drive on its highways and the registration of vehicles which are driven on those highways. If it may insist on these requirements, it obviously may take steps necessary to enforce compliance. The reasonableness of the enforcement measure chosen by the State is tested by weighing its intrusion on the motorists' Fourth Amendment interests against its promotion of the State's legitimate interests. *E. g., United States* v. *Brignoni-Ponce,* 422 U. S. 873, 878 (1975).

In executing this balancing process, the Court concludes that given the alternative mechanisms available, discretionary spot checks are not a "sufficiently productive mechanism" to safeguard the State's admittedly "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." *Ante,* at 659, 658. Foremost among the alternative methods of enforcing traffic and vehicle

---

*Indeed, this distinction was expressly recognized in *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 883 n. 8 (1975):

"Our decision in this case takes into account the special function of the Border Patrol, the importance of the governmental interests in policing the border area, the character of roving-patrol stops, and the availability of alternatives to random stops unsupported by reasonable suspicion. Border Patrol agents have no part in enforcing laws that regulate highway use, and their activities have nothing to do with an inquiry whether motorists and their vehicles are entitled, by virtue of compliance with laws governing highway usage, to be upon the public highways. Our decision thus does not imply that state and local enforcement agencies are without power to conduct such limited stops as are neccessary to enforce laws regarding drivers' licenses, vehicle registration, truck weights, and similar matters."

safety regulations, according to the Court, is acting upon observed violations, for "drivers without licenses are presumably the less safe drivers whose propensities may well exhibit themselves." *Ante,* at 659. Noting that "finding an unlicensed driver among those who commit traffic violations is a much more likely event than finding an unlicensed driver by choosing randomly from the entire universe of drivers," *ibid.,* the Court concludes that the contribution to highway safety made by random stops would be marginal at best. The State's primary interest, however, is in traffic safety, not in apprehending unlicensed motorists for the sake of apprehending unlicensed motorists. The whole point of enforcing motor vehicle safety regulations is to remove from the road the unlicensed driver before he demonstrates why he is unlicensed. The Court would apparently prefer that the State check licenses and vehicle registrations as the wreckage is being towed away.

Nor is the Court impressed with the deterrence rationale, finding it inconceivable that an unlicensed driver who is not deterred by the prospect of being involved in a traffic violation or other incident requiring him to produce a license would be deterred by the possibility of being subjected to a spot check. The Court arrives at its conclusion without the benefit of a shred of empirical data in this record suggesting that a system of random spot checks would fail to deter violators. In the absence of such evidence, the State's determination that random stops would serve a deterrence function should stand.

On the other side of the balance, the Court advances only the most diaphanous of citizen interests. Indeed, the Court does not say that these interests can never be infringed by the State, just that the State must infringe them en masse rather than citizen by citizen. To comply with the Fourth Amendment, the State need only subject *all* citizens to the same "anxiety" and "inconvenien[ce]" to which it now subjects only a few.

For constitutional purposes, the action of an individual law enforcement officer is the action of the State itself, *e. g., Ex parte Virginia,* 100 U. S. 339, 346–347 (1880), and state acts are accompanied by a presumption of validity until shown otherwise. See, *e. g., McDonald* v. *Board of Election,* 394 U. S. 802 (1969). Although a system of discretionary stops could conceivably be abused, the record before us contains no showing that such abuse is probable or even likely. Nor is there evidence in the record that a system of random license checks would fail adequately to further the State's interest in deterring and apprehending violators. Nevertheless, the Court concludes "[o]n the record before us" that the random spot check is not "a sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests which such stops entail." *Ante,* at 659. I think that the Court's approach reverses the presumption of constitutionality accorded acts of the States. The burden is not upon the State to demonstrate that its procedures are consistent with the Fourth Amendment, but upon respondent to demonstrate that they are not. "On this record" respondent has failed to make such a demonstration.

Neither the Court's opinion, nor the opinion of the Supreme Court of Delaware, suggests that the random stop made in this case was carried out in a manner inconsistent with the Equal Protection Clause of the Fourteenth Amendment. Absent an equal protection violation, the fact that random stops may entail "a possibly unsettling show of authority," *ante,* at 657, and "may create substantial anxiety," *ibid.,* seems an insufficient basis to distinguish for Fourth Amendment purposes between a roadblock stopping all cars and the random stop at issue here. Accordingly, I would reverse the judgment of the Supreme Court of Delaware.