**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 94-60587

_____

UNITED STATES OF AMERICA

Plaintiff-Appellant,

versus

PABLO RAMIREZ-GONZALEZ

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Texas

_____

June 28, 1996

Before KING, DeMOSS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The United States appeals the granting of Ramirez-Gonzalez's motion to suppress evidence seized at a temporary motor vehicle checkpoint. Because we conclude that the record is insufficiently developed for our review of the constitutional question raised, we VACATE and REMAND to the district court for further proceedings.

**FACTS**

"Operation Gauntlet" was a multi-agency law enforcement effort planned in three or four meetings by several law enforcement agencies. Apparently, the Customs Service was under the impression that this was a drug-interdiction effort, but some of the local agencies involved believed that it was a multi-purpose effort. In any case, as a result of these meetings, the Nueces County Precinct Two Constable's office operated two criminal law enforcement checkpoints near Corpus

Christi, Texas, for three days in January 1994. The checkpoints were identified by large traffic signs posted over 100 yards away which read "Drug Interdiction Checkpoint." They were operated only at night, between 8 p.m. and 6 a.m. Marked police cars were present at the checkpoints and had their emergency lights on. Vehicles traveling in all directions through the intersections were stopped and the drivers were asked to produce their driver's licenses and proofs of insurance. The officers usually asked for permission to search the vehicles; but if no consent was given, the vehicle was allowed to proceed unless the officers believed they had reasonable suspicion to search the vehicle. During the three days the constable's office operated the two checkpoints, the officers stopped 817 vehicles, searched 103 vehicles, issued 33 traffic citations, arrested 150 undocumented aliens, and arrested 7 people for possession of controlled substances. On January 29, 1994, around 1:30 a.m., a red Chevrolet pickup truck with a camper and a Chevrolet Blazer together approached one of the checkpoints and were stopped. Ramirez-Gonzalez was a passenger in, and the owner of, the Blazer. Deputy Constable Robert Smith requested driver's licenses and other documents from both drivers. He then noticed several people in the bed of the pickup.[1] No one in either vehicle spoke English, and the law enforcement officers at the checkpoint did not speak Spanish. Smith was not sure whether he had been given consent to search, so Border Patrol agents were sent for to help with translation and identification.

Both vehicles were detained between 10 and 25 minutes before the Border Patrol arrived and determined that five passengers in the Blazer and fifteen passengers in the pickup were illegal aliens. As a result, Ramirez-Gonzalez was charged with several illegal immigrations charges. Ramirez-Gonzalez filed a motion to suppress evidence obtained when he was stopped at the checkpoint, alleging that the stop was an illegal seizure without reasonable suspicion in violation of his Fourth Amendment rights.

---

[1]While Smith's affidavit indicates that the people in the bed of the pickup were attempting to hide under a spare tire and other objects, the affidavit of one of those people alleges that it was cold and they were attempting to keep warm under a blanket.

The district court preliminarily denied the motion at the suppression hearing, but agreed to consider the parties' supplemental briefs on the issue. Ramirez-Gonzalez pled guilty to one of the counts, and the government dismissed the others. At the sentencing hearing held after the parties had filed their supplemental briefs, the court again denied Ramirez-Gonzalez's motion, but ruled that it would permit him to reopen the issue. Subsequently, Ramirez-Gonzalez filed a motion to postpone entry of the judgement, a motion to withdraw his guilty plea, and a motion for rehearing of the suppression issue. The district court granted the motions and reversed its earlier ruling, suppressed the evidence obtained from the checkpoint stop.[2] The government appealed the new ruling, the trial was ordered stayed pending resolution of the appeal, and Ramirez-Gonzalez was released on bond pending appeal.

## DISCUSSION

Because this is an appeal by the United States from a decision suppressing evidence before the verdict and before the defendant has been put in jeopardy, this court has jurisdiction pursuant to 18 U.S.C. § 3731. United States v. Ceccolini, 435 U.S. 268, 271 n.1, 98 S. Ct. 1054, 55 L. Ed. 2d 268 (1978).

At issue in this case is the extent to which law enforcement may employ a temporary checkpoint. Any resolution of this issue necessarily entails a review of the Supreme Court precedent with reference to temporary checkpoints.

### A Fourth Amendment Seizure

Stopping a vehicle and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief." Delaware v. Prouse, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979). The issue then becomes whether such a seizure was reasonable under the Fourth Amendment because "[t]he essential purpose of the proscription in the Fourth Amendment is to impose a standard of

---

[2]The district court specifically allowed Ramirez to withdraw his guilty plea. The government expressly waived any objection to the district court's decision to permit Ramirez-Gonzalez to withdraw the plea and does not challenge this on appeal.

**3**

'reasonableness' upon the exercise of discretion by government officials in order to 'safeguard the privacy and security of individuals against arbitrary invasion.'" Delaware v. Prouse, 440 U.S. at 653-54 (citation omitted). Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Id. at 654.

A checkpoint does not violate the Fourth and Fourteenth Amendments to the United States Constitution so long as the balance of the State's interest, the extent to which the checkpoint can reasonably advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, tilts in favor of the checkpoint program. See Brown v. Texas, 443 U.S. 47, 50-51, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979). The Supreme Court has found two such checkpoints to be reasonable: (1) a temporary checkpoint intended to deter and detect drunk drivers and set up pursuant to a detailed committee plan (Michigan State Police v. Sitz, 496 U.S. 444, 449, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990)), and (2) a permanent checkpoint set up to detect illegal aliens (United States v. Martinez-Fuerte, 428 U.S. 543, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976)). The Court has also recognized that a state has a substantial interest in enforcing licensing and registration laws, though that interest is not substantial enough to justify roving patrol stops as an enforcement mechanism. See Delaware v. Prouse, 440 U.S. at 658.

**United States v. Martinez-Fuerte**

In United States v. Martinez-Fuerte, the Court resolved a circuit split about the constitutionality of permanent immigration checkpoints operated by the Border Patrol, and instituted to interdict the flow of illegal entrants from Mexico. Martinez-Fuerte, 428 U.S. at 552. As established by previous cases, the Court noted various estimates showing a large number of illegal immigrants, as well as formidable law enforcement problems in interdicting the flow of illegal immigrants. Martinez-Fuerte, 428 U.S. 551-52 (citing United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975)). In developing these permanent checkpoints, the Border Patrol felt that the checkpoints were most effective when (1) distant enough from the border

**4**

to avoid interference with traffic in populated areas near the border, (2) close to the confluence of two or more significant roads leading away from the border, (3) situated in terrain that restricts vehicle passage around the checkpoint, (4) on a stretch of highway compatible with safe operation, and (5) beyond the 25-mile zone in which "border passes" are valid. Martinez-Fuerte, 428 U.S. at 553. The Court then looked to the specifics of one of the two cases it was considering and found that the record provided a rather complete picture of the effectiveness of the permanent checkpoint: in one eight-day period, Border Patrol agents found 725 deportable aliens in 171 vehicles. The Court considered the purpose of the checkpoint stops and recognized that the maintenance of a traffic-checking program in the interior was necessary because the flow of illegal aliens could not be effectively controlled at the border. Martinez-Fuerte, 428 U.S. at 556.

As balanced against this need, the Court found that the consequent intrusion on Fourth Amendment interests was limited. While the stop intruded to a limited extent on motorists' right to "free passage without interruption," and arguably on their right to personal security, it involved only a brief detention during which all that was required of the vehicle's occupants was a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States. Martinez-Fuerte, 428 U.S. at 556. Neither the vehicle nor its occupants were searched without probable cause, and visual inspection of the vehicle was limited to what could be seen without a search. Id. at 556.

**Michigan State Police v. Sitz**

In Sitz, the Court considered the constitutionality of a temporary checkpoint set up to detect and curb drunk driving. The Court began its discussion with a review of the development of the sobriety checkpoints at issue in the case, noting that the program had been developed by a committee consisting of law enforcement agencies and research institutes. Michigan Dep't of State Police v. Sitz, 496 U.S. at 447. It also mentioned the specifics of the procedures followed in stopping traffic, and then applied the three-prong test delineated in Brown v. Texas and United States v. Martinez-Fuerte. Sitz, 496 U.S. at 447-450. The Court found that the state had an interest in curbing drunken

5

driving and that this was an interest of great magnitude based on statistics provided by various studies as well as noted in the Court's own prior decisions. Id. at 451. The Court then measured the extent of the intrusion on motorists, dividing that intrusion into "objective" and "subjective" components. Objectively, an intrusion is minimal where the duration of the seizure and intensity of the investigation is minimal. Id. at 451. Subjectively, the intrusion should be measured according to the potential for generating fear and surprise in law-abiding motorists by the nature of the stop. Id. at 452. The Court concluded that objectively, the Sitz checkpoint's intrusion was minimal because the stop was of short duration (the delay for each vehicle averaged 25 seconds), and the field officer's discretion was severely limited by guidelines that delineated how the stop was to be conducted. Sitz, 496 U.S. at 453. The Court also concluded that the Sitz checkpoint's intrusion was subjectively minimal because all cars were stopped, and motorists were much less likely to be frightened or annoyed by the intrusion than they would be if subjected to a roving-patrol stop. Id. at 453.

**Evidentiary Hearing**

The Supreme Court cases are predicated on the requirement that the trial court determine the purpose or purposes of a checkpoint before it undertakes any analysis of whether the checkpoint comports with the requirements of the Fourth Amendment. Arguably, in determining the purpose or purposes of any checkpoint, a distinction must be drawn between the law enforcement objective or objectives that the checkpoint was designed to advance, and incidental law enforcement benefits that may flow from the checkpoint stops. Whether Operation Gauntlet was conceived of as having one principal purpose with reasonably anticipated incidental law enforcement benefits, or whether it was designed to have multiple principal purposes are questions which cannot be answered from the record as it stands before us.

Though the defendant made his motion to suppress the evidence early in the proceedings in this case, the district court denied it twice before finally granting the motion to suppress after sentencing. The district court's vacillation in its rulings on the motion to suppress can reasonably be

**6**

attributed to the paucity of information developed from the witnesses and the government's inconsistent positions about the purpose of the checkpoints.

The Government vehemently argues that the purpose of the roadblock operations known as "Operation Gauntlet" was to identify and arrest persons engaged in criminal violations of any nature. The Government argued to the district court and to this court that the checkpoints were based on general crime prevention concerns. Contradicting the Government's assertion that this was a generalized criminal purposes case was (1) the large sign on the roadway entitled "Drug Interdiction Checkpoint," (2) the presence of numerous canine units for drug sniffing (including one from the Navy), (3) the fact that the officers requested permission from the driver to search each vehicle, and (4) the fact that the late night hours and rural locations at which the checkpoints were held are intrinsically much more likely to detect drug transportation than to detect license and registration violations.

Instead of holding a full evidentiary hearing to ascertain the true purpose of the stop, the district court considered the motion to suppress based on the government's oral assertion that general crime prevention was at the heart of the operation. This assertion was countered by the defendant's claim that the purpose of the checkpoint was drug interdiction. These arguments were later supplemented by three affidavits which confused rather than clarified the inquiry. The government's second supplementary response to the motion to suppress starts out by describing Operation Gauntlet as "a multi-agency response to criminal activity in the Corpus Christi, Texas area." The government supported its supplementary response with the three above-mentioned affidavits. One affidavit is from Monty L. Price, a senior special agent with the Customs Service who stated that Operation Gauntlet was a joint interdiction effort "intended to present high profile enforcement activity . . . so that northbound loads of drugs would divert to smaller county roads to avoid detection." The expectation, according to Price, was that these diverted loads of drugs would then be detected at temporary checkpoints set up on the county roads.

Contrary to Special Agent Price's testimony, we find that Nueces County deputy constable Robert Smith stated in his affidavit that "[r]oadblock checkpoints were to to be used to detect individuals who's [sic] conduct was in violation of laws, be it traffic violations, controlled substances, or otherwise." Added to this mix is the testimony of W.F. Gibbens, elected Constable for Precinct Two of Nueces County whose affidavit stated, "the purpose of Operation Gauntlet was to establish various traffic and criminal law enforcement checkpoints in multiple locations in the vicinity of Corpus Christi, Texas. The officer's [sic] manning the checkpoints attempted to identify individuals engaging in acts which constituted a violation of the law, be it traffic violations, controlled substances, game violations, or whatever."

The record shows that while the parties agreed in general about how the Operation was conducted and other similar facts, when the government proposed its stipulation to a general crime prevention purpose, the defense ardently contested this assertion.[3] The trial court then attempted to analyze the constitutionality of the checkpoint based on the government's contested assertion that the purpose was one of general crime prevention. Given the adversarial nature of the positions taken concerning the constitutional issues at stake and the inherently fact intensive quality of a motion to suppress, the trial court would have been better served to have determined the primary purpose of and need for the checkpoints after a full evidentiary hearing.

An appellate court necessarily bases its review on the record developed by the trial court, and it relies heavily on the trial court's factual findings unless those findings are clearly erroneous. However, in order to be able to review the trial court's findings, an appellate court must have a well-developed record to review. After carefully reviewing the sparse record in this case, we conclude that the parties overemphasized expediency in the hearing below to the detriment of providing a clear

---

[3]This dissention distinguishes this case from <u>Merrett v. Moore</u>, 58 F.3d 1547 (1995), *reh'g en banc denied* 77 F.3d 1304 (11th Cir. 1996). While <u>Merrett</u> was decided in a summary judgment posture based upon a series of orders, the facts were undisputed. Indeed, the parties agreed not only as to how the operation was carried out, but also that the several purposes urged by the government for the search and seizures were in fact what was carried out. The Eleventh Circuit was presented a clear record on the facts and the court was left only with making a legal determination regarding the efficacy and constitutionality of the search and seizure.

and complete record from which this court can measure the district court's ultimate ruling against the background of Supreme Court precedent. For the foregoing reasons, we VACATE and REMAND to the district court with instructions to conduct an evidentiary hearing. Any appeal from the district court's decision on remand shall be to this panel.