# United States Court of Appeals
## For the First Circuit

No. 08-2303

UNITED STATES OF AMERICA,

Appellee,

v.

MOISE WILLIAM,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin, Circuit Judge,
and Saylor,[*] District Judge.

Judith Mizner, Assistant Federal Public Defender, Federal Defender Office, with whom Martin J. Vogelbaum, Assistant Federal Public Defender, Federal Defender Office, was on brief for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom Aixa Maldonado-Quiñones, Assistant United States Attorney, and Michael J. Gunnison, Acting United States Attorney, were on brief for appellee.

April 22, 2010

---

[*]Of the District of Massachusetts, sitting by designation.

**BOUDIN, Circuit Judge**.  On the evening of July 21, 2007, Moise William's car was halted at a sobriety checkpoint on New Hampshire Route 28 manned by Auburn, New Hampshire, police officers.  The checkpoint had been authorized by a state judge on petition of the town's police department.  All vehicles (except tractor trailers due to parking-space problems) were stopped briefly.  When William rolled down the driver's side window, the officer who had approached smelled marijuana and noticed that William's eyes were glassy and bloodshot.  The officer asked William to step out of the car.

In the ensuing search of the car, marijuana was found.  During the search, a fireman standing nearby saw William throw a package on the ground; later testing revealed it to contain crack cocaine.  A further search with a drug-sniffing dog revealed more marijuana in the car.  William was arrested and indicted on two counts of possessing a controlled substance, one for marijuana and the other for "cocaine base ('crack')."  21 U.S.C. § 844(a) (2006).  The government also alleged that the crack cocaine weighed three or more grams and filed an information pursuant to 21 U.S.C. § 851 alleging that William had a prior conviction for possession of crack cocaine.

William moved to suppress all of the drug evidence on the ground that the drugs were the fruits of an illegal stop.  The district court held a hearing, heard testimony, and concluded that

the stop of William's car was lawful.  In response to a second motion to suppress, the court also held that the car search was lawful, but that issue is not before us on this appeal.  Thereafter William was tried on both counts.

Among the items seized when William was stopped was a wrapper containing eleven small bags.  At trial a government expert testified that these contained crack cocaine weighing approximately 3.6 grams; but pursuant to laboratory policy, the expert had weighed only five of the eleven bags, determined the average weight per bag, and multiplied by eleven to estimate the total weight of all of the bags.  The five bags tested weighed 1.64 grams, making the expert's estimate 3.6 grams for all eleven.[1]

Although the weight went only to penalty, the issue was submitted to the jury--as required by Apprendi v. New Jersey, 530 U.S. 466 (2000)--because a weight exceeding three grams would raise the maximum possible penalty.  21 U.S.C. § 844(a).  The trial judge expressed unease about the chemist's method, given that the margin was small (3 grams versus 3.6) and the standard of proof was "beyond a reasonable doubt."  However, the trial court denied William's motion seeking a judgment of acquittal based on the weight issue, Fed. R. Crim. P. 29, and the jury convicted William

---

[1]The chemist also testified that he tested only five of the eleven bags to determine whether the substance inside was cocaine base in the form of crack cocaine, but that all of the bags contained "an off-white powdery chunky material."

on both counts and found by special verdict that the total amount of crack cocaine exceeded three grams.

In sentencing William on the crack cocaine conviction, the trial court applied a statutory provision, 21 U.S.C. § 844(a), setting a five-year mandatory minimum sentence for possession of more than three grams of cocaine base when the defendant has a "prior conviction. . . under this subsection." The court sentenced William to the five-year prison term, to run concurrently with a one-year sentence for possession of marijuana. William now appeals to challenge both his conviction and sentence on the crack cocaine charge.

The challenge to the conviction rests solely on the lawfulness of the stop. Although individualized suspicion is normally required for a car stop and "probable cause" is required for an arrest, the Fourth Amendment rubric is "reasonableness." City of Indianapolis v. Edmond, 531 U.S. 32, 37 (2000); United States v. Almeida, 434 F.3d 25, 28 (1st Cir. 2006). Under this rubric, the Supreme Court has permitted vehicle checkpoints and very brief inquiries of all drivers for certain purposes and with certain safeguards: one of the allowed uses is for sobriety checkpoints, the principal authority being Michigan Department of State Police v. Sitz, 496 U.S. 444 (1990).[2]

---

[2]See also Illinois v. Lidster, 540 U.S. 419, 423-28 (2004) (upholding checkpoint to locate witnesses to a hit-and-run); United States v. Martinez-Fuerte, 428 U.S. 543, 545 (1976) (upholding

-4-

The threshold requirement under Sitz and Edmond--that sobriety concerns be the primary purpose of the checkpoint--is met in this case. See Edmond, 531 U.S. at 47-48; Sitz, 496 U.S. at 451. New Hampshire has a general procedure for authorizing sobriety checkpoints; and in this case a plan was submitted and approved by a state judge, and the directions to the officers were consistent with operating a sobriety checkpoint. The police were aware that other crimes might come to light; thus, a drug-sniffing dog was kept in reserve but brought forward to William's car only after drugs had been initially found due to William's appearance and the odor of marijuana.

William's argument that the checkpoint's primary purpose was something other than detecting impaired driving consists mostly of objections to the quality of the statistical data cited in the petition seeking approval for the checkpoint. But such weaknesses give no reason in this case to think that the district court clearly erred in concluding that the government was in fact conducting a sobriety checkpoint. United States v. Green, 293 F.3d 855, 859 (5th Cir. 2002) (reviewing district court findings on primary purpose for clear error); United States v. Davis, 270 F.3d 977, 980 (D.C. Cir. 2001) (same).

William cites two decisions from the District of Columbia Circuit that have found traffic checkpoints doubtful in particular

checkpoint near border to detect illegal aliens).

-5-

cases, but in both cases, the evidence suggested that the stops were not primarily vehicle registration checks, as the officers claimed, but rather general anti-crime stops implemented as part of broader crime-control task forces. See United States v. Bowman, 496 F.3d 685, 693-94 (D.C. Cir. 2007) (remanding for further fact-finding on primary purpose); United States v. Davis, 270 F.3d 977, 981-82 (D.C. Cir. 2001) (same). The reasons for allowing one kind of use and barring another can be debated; but the short answer is that the Supreme Court has thus distinguished and that is the end of the matter. Edmond, 531 U.S. at 47-48.

Other cases William cites likewise involved affirmative evidence that the checkpoint's stated purpose was pretextual. United States v. Huguenin, 154 F.3d 547, 555-56 (6th Cir. 1998) (checkpoint funded by drug interdiction sources was supervised by narcotics officer); United States v. Ramirez-Gonzalez, 87 F.3d 712, 715-16 (5th Cir. 1996) (remanding for an evidentiary hearing based on similar evidence). Unlike those cases, William does not show that the Auburn checkpoint was part of some task force or program aimed at some purpose other than sobriety.

Beyond assessing the legitimacy of the purpose, Sitz and other checkpoint cases have used Brown v. Texas, 443 U.S. 47, 50-51 (1979), as the source of a further balancing test for determining the reasonableness of the checkpoint. Several formulations have been used but a helpful summary is provided by a Fourth Circuit

decision, <u>United States</u> v. <u>Henson</u>, No. 08-4221, 2009 WL 3792435, at *2 (4th Cir. Nov. 13, 2009) (citations omitted):

> If the primary purpose was valid, the court must then judge the checkpoint's reasonableness on the basis of individual circumstances. . . . This requires balancing "'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" . . . Factors to weigh intrusiveness include whether the checkpoint: (1) is clearly visible; (2) is part of some systematic procedure that strictly limits the discretionary authority of police officers; and (3) detains drivers no longer than is reasonably necessary to accomplish the purpose of checking a license and registration, unless other facts come to light creating a reasonable suspicion of criminal activity.

In the present case, <u>Sitz</u> establishes the "gravity of the public concerns" with the death and injury toll taken by drunken drivers and the fact that sobriety checkpoints can "advance the public interest" sufficiently to make such a checkpoint reasonable. 496 U.S. at 451. William argues, however, that the data offered to support the use of <u>this</u> checkpoint at <u>this</u> location was inadequate and that the results in arrest numbers were unimpressive. Certainly one can imagine a purported sobriety checkpoint whose location or timing was demonstrably unlikely to be of use.

But in <u>Sitz</u>, Chief Justice Rehnquist went out of his way to say that whether and where to establish a stop is primarily a judgment for state or local officials. 496 U.S. at 453-54. In addition, using the number of drunk driving arrests resulting from

-7-

a specific checkpoint has at least two problems: one is that the reasonableness of the effort is primarily a forward-looking exercise (in fact, the percentage of arrests in <u>Sitz</u> was very low, <u>id.</u> at 455); and the other is that sobriety checkpoints likely have a deterrent value apart from immediate detentions resulting from the stops.

In this case, the police petition and affidavit supporting the court order showed that the checkpoint was on a regularly used highway and that the days and the hours selected were nights in or around weekends when party-going would be most likely to generate drunk driving. Much of the data offered in the petition in this case as to drunk driving and the utility of checks related to New Hampshire rather than the location chosen; but in <u>Sitz</u> most of the data was nationwide. 496 U.S. at 451. This is far from the case of a checkpoint on a dead-end road.

The other concerns in <u>Brown</u> v. <u>Texas</u> center around the intrusiveness of the search and its potential for abuse. This begins with the distinction drawn by the courts between fixed checkpoints and random "roving" stops that are highly stressful for the innocent individual pulled over by flashing lights and siren. <u>Sitz</u>, 496 U.S. at 452-53; <u>Martinez-Fuerte</u>, 428 U.S. at 558. An orderly checkpoint usually reveals itself as a general stop of all vehicles and is deemed less alarming. <u>Martinez-Fuerte</u>, 428 U.S. at 559.

-8-

William argues that the checkpoint in this case was not well-marked, that it was operated in a sloppy fashion, and that the handling of William's drug evidence was badly documented.  But the checkpoint constrained officers' discretion in the areas most important to the constitutional analysis: the checkpoint occurred at a fixed location, the officers stopped every car passing through, and further investigation occurred only if individualized suspicion developed.  The concerns with roving stops and unlimited officer discretion were absent.  Sitz, 496 U.S. at 452-54; Delaware v. Prouse, 440 U.S. 648, 661 (1979).

In his opening brief, William also challenged his sentence.  In sentencing William for the cocaine base conviction, the trial court applied a provision of 42 U.S.C. § 844(a) fixing a five-year mandatory minimum sentence for possession of more than three grams of cocaine base where, as alleged here, the defendant has a prior conviction under that subsection.  William argues to us, as he did to the trial judge, that the evidence of weight was inadequate and warranted a judgment of acquittal as to weight.

The main argument is that the weighing of five bags out of eleven was insufficient absent a basis for the jury to be sure the bags were similar in weight, and the expert gave no specific reason to support the assumption.  The trial judge, as noted, shared the defendant's doubt but left the issue to the jury.  William points out that, given the sentencing jurisprudence, the

weight issue required a finding beyond a reasonable doubt to raise the permissible maximum above the one-year default. See 21 U.S.C. § 844(a); United States v. Eirby, 262 F.3d 31, 36-37 (1st Cir. 2001).

The problem is an ongoing one. Reasonable estimation techniques are permitted;[3] it is perhaps implicit here that the expert deemed the bags comparable in weight, and, in addition, the bags were available to the jury who could judge from appearance.[4] Indeed, the bags may well have been professionally prepared for sale, which would support the inference; William had three cellphones and lots of cash in his possession when arrested. Still, the margin (3.6 grams as against 3) was not large and only a couple of light weight bags among those unweighed could have made the difference.

We need not pursue the issue--one could say much more on both sides--beyond agreeing with the trial judge that this was a close case and therefore a warning to prosecutors in future cases: it would have been easy to shore up the estimate as the case headed for trial. However, both sides agree that on appeal a clear-cut

---

[3]United States v. Correa-Alicea, 585 F.3d 484, 489-91 (1st Cir. 2009); United States v. Rodriquez, 525 F.3d 85, 107-09 (1st Cir. 2008).

[4]Although defense counsel points out that the tested drugs from five of the bags were no longer in lump form, uniformity in size of the lumps in the remaining six bags would still permit an inference that all of the bags were roughly uniform.

error in sentencing has now come to light that precludes the use of the higher sentence even if weight exceeded three grams and that William has already served what may well be the maximum sentence for his offense.

The provision applied to William--a five-year minimum and a twenty-year maximum--required not only more than three grams of cocaine but also a "prior conviction . . . under this subsection." 21 U.S.C. § 844(a). William's prior conviction, both sides now agree, was for a <u>state</u> drug offense and does not meet the requirements of § 844(a) for a sentence above two years.

William's prior state law conviction did increase the statutory range to more than the default maximum of one year: where the defendant has "a prior conviction for any drug, narcotic, or chemical offense chargeable under the law of any State," the minimum term is fifteen days and the maximum term is two years. <u>Id.</u>. Weight is irrelevant to this provision and, although the issue was not raised in the district court, the government concedes plain error in a sentence exceeding two years.

When this concession was made, William had served more than two years in jail and so might have been released on bail pending review, but he rejected the proposal for reasons relating to exposure to possible deportation proceedings. Accordingly, we now <u>affirm</u> his conviction, <u>vacate</u> his sentence and <u>remand</u> the case

to the district court for re-sentencing.    The mandate will issue forthwith without prejudice to any petition for rehearing.

It is so ordered.