THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
GLORIA MILLER, Defendant-Appellant.

First District (1st Division)    No. 78-957

Opinion filed June 25, 1979.

Reilley, Bell & Weinberg, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Michael R. Sherwin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Gloria Miller, was indicted on two counts of possession of a controlled substance. After a bench trial, defendant was found guilty as charged. The circuit court of Cook County sentenced her to concurrent terms of imprisonment of 4 to 6 years on count one and 1 to 3 years, plus a $1000 fine, on count two. Defendant appeals the judgments of conviction, contending only that the trial court erred in denying her motion to quash her arrest and suppress physical evidence.

Officer Cleophus Johnson was called as a witness on the motion to suppress. Johnson testified that on April 25, 1975, at about 12:45 a.m., his partner, Officer Nathan Gibson, 8 to 10 other officers and himself had occasion to execute a search warrant. The warrant stated that there was probable cause to believe that a quantity of heroin was located upon the person of Carolyn Harris and in her third-floor apartment in Chicago. The officers were in plain clothes and forced their way through the front door by using crowbars and sledge hammers. They searched the apartment for about one to 1½ hours, discovering a quantity of narcotics and three handguns. As a result, James and Carolyn Harris were arrested for possession of narcotics.

According to Johnson, about 1½ hours after the officers' entry, while they were concluding their search in the living room, he heard a knock at the rear door. When he first saw the defendant, she and a male companion (Earl Charles) had entered through the back door and were walking to the living room. Johnson testified that he did not draw his gun and did not see Gibson's weapon drawn. Nor did the officers order defendant or her companion to enter the apartment.

Johnson further testified that the officers asked Charles who he was, why he was there and whether he lived there. His response, if any, is not of record. Approximately two to three minutes after defendant and Charles entered the apartment, the officers searched Charles and recovered a weapon. Johnson testified that at the time of this search defendant was not free to leave. A few minutes later Johnson noticed a large bulge in defendant's pants. Upon questioning, defendant replied that it was a sanitary napkin. Officer Johnson told her, "it wouldn't stick out like that" and said she would have to be handcuffed until she was searched by a police matron. According to Johnson, Charles whispered to defendant that she "might as well give it to him." At this point defendant proceeded to the bathroom accompanied by the officers. She unzipped her pants and removed two clear plastic bags containing a brown narcotic powder. Defendant was arrested and transported to the police station, where she produced more narcotics from her bra.

On cross-examination, Johnson testified that the rear door of the apartment leads to an enclosed porch. The majority of the officers involved in the search had already left the premises when defendant arrived. He indicated that the bulge in defendant's pants was pointed and could have been another weapon. When defendant was walking to the bathroom, Johnson remained close behind her.

On redirect examination, Johnson explained that when defendant and Charles knocked on the door, the officers had already searched every room in the apartment, but were making a final search of the living room. Officer Johnson also testified concerning his safety:

> "Q. You said when you saw the bulge you believed in your mind that it was a weapon, is that correct?
> A Yes.
> Q You didn't have a weapon drawn?
> A No.
> Q Therefore, Officer, were you in fear for your safety at this point?
> A Not at this point.

* * *

> Q At anytime that evening before she gave you some objects

from her pants were you in fear of your safety because you thought she had a weapon in her pants?

A No.

\* \* \*

Q When did you feel that your safety was in danger?

A If I turned my back she would have a chance to go in her pants, but as long as I was facing her, I didn't feel—

\* \* \*

Q Did you ever turn your back on Gloria Miller?

A No."

Defendant was not handcuffed until she was arrested. On recross-examination, Johnson explained that if defendant made a move, he could keep physical control.

Johnson's partner, Officer Nathan Gibson, also testified at the suppression hearing. Gibson stated that at about 2 a.m., he and Johnson first encountered defendant and Charles in the kitchen. He observed that the door between the kitchen and the enclosed porch was open. There was a wooden door from the porch to the outside which had a lock.

Gibson was the first officer to confront defendant and he had his weapon drawn. He testified that Johnson was behind him and did not have his weapon drawn. Gibson informed the couple that a "flash raid" was being conducted. Charles said he had come to see Carolyn Harris. According to Gibson, he did not point his weapon at the couple and neither officer directed them to enter the apartment. The officers frisked Charles and recovered a handgun. Gibson subsequently noticed a large bulge shaped like a half moon in the crotch of defendant's pants. When Gibson questioned defendant about the bulge, she said it was contraband. Charles told her to give the contraband to the officers. She surrendered the contraband, was arrested and advised of her rights. At the station she informed the police she had more contraband in her bra.

Defendant did not make any movements or gestures to indicate to the officer that he had reason to fear for his safety. Nonetheless, Gibson was cautious because of the handguns previously recovered and because defendant had not been searched. He did not turn his back on defendant. Gibson also stated that from the moment defendant entered the apartment she was not free to leave.

Officer Gibson further testified as to his frame of mind upon encountering defendant and Charles:

"\* \* \* [W]e were conducting this raid, and when I met Gloria Miller and Earl Charles in the kitchen in the area, I did not know why they were there. And when they informed me they wanted to see Carolyn Harris, whom we had a search warrant for, and her

premises, I felt that it was necessary to conduct a protective search of the male."

Gibson stated that it was his intention to conduct an investigatory "field interview" of the couple upon their entry.

James Harris testified for the defendant that on April 25, 1975, he lived with his wife and two small children in the third-floor apartment named in the warrant. He had gone to bed at about 4 p.m. and was awakened between 9 and 10 p.m. by policemen breaking down the front door. The police conducted a search of the apartment and ultimately arrested James and Carolyn Harris.

According to Harris, between 3 and 3:30 a.m. he was sitting handcuffed in the living room with his wife, two children, and Officers Kelly, Johnson and Gibson. They were waiting for Carolyn Harris' mother to arrive to pick up the children before being transported to jail. All the other officers had left the premises; the search had been completed 30 to 45 minutes previously and the officers were listening to his stereo.

At this time and under these circumstances, there was a knock at the back door of the apartment. Harris testified that this door led outside of the apartment and was padlocked and secured from the inside by an iron bar, commonly called a police lock. Inside this door was an enclosed porch. French doors separated the porch from the kitchen. Harris further testified that Officers Johnson and Gibson went to answer the door. It took them two to three minutes to operate the police lock and open the door. Both officers were in the enclosed porch area. Gibson opened the door, directed defendant and Charles inside with a waving motion of his left hand, and with his right hand pointed his service revolver out the door.

The trial court considered all of the above evidence and made certain findings of fact. Initially, the court found that:

> "* * * [T]o place the testimony of Officer Gibson alongside the testimony of Officer Johnson, the only reasonable conclusion would be that they are not credible witnesses, that the contradictions in their testimony, I think, are unexplainable. I won't go down the entire list of them."

The court found Harris' testimony credible and accepted it for the purpose of its opinion.

After resolving credibility, the trial court stated additional findings which follow in pertinent part:

> "There was a knock on the door in the early morning hours of April 25th of 1975. The police were on the premises, had conducted a search pursuant to a lawful warrant,* * *.
>
> I find the police invited, and I use the term invited in much the same way the Court use [sic] directed in Pugh, invited Gloria Miller and Earl Charles, her companion, into the premises; one

officer having his gun drawn at least. And I find further that it was not a voluntary entry onto the premises.

I further find that the police were on the premises for a proper purpose, that they had at that point already found contraband during a lawful search and were in the process of * * * taking the Harrises into custody.

I find that while the search itself had been completed, the police were still in the place where they had a right to be and that they were waiting for somebody in the family to arrive to care for the children of Mr. and Mrs. Harris.

I further find that three handguns had been found in the apartment before Gloria Miller entered the premises."

Under these facts, the trial court ruled that section 108—9 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 108—9), and *People v. Pugh* (1966), 69 Ill. App. 2d 312, 217 N.E.2d 557, enabled the officers to legally require defendant and Charles to enter the premises. Moreover, the court believed the officers had a right to frisk them for weapons.

The sole issue on appeal is whether, pursuant to section 108—9 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 108—9) and decisional law, the police may order a citizen not on the premises nor named in the search warrant to enter and subject themselves to a search.

For purposes of this opinion we accept, in substance, the trial court's findings of fact. However, we find the officers had no legal right to force defendant onto the premises and search her. Accordingly, we reverse and remand.

Preliminary to determining whether the search was valid, the State does not contend that defendant acted voluntarily in turning over the contraband stored in her pants. Thus, they have conceded that presenting defendant with the choice of cooperation or, handcuffing and subsequent search by a police matron constituted a search under the fourth amendment. U.S. Const., amend. IV.

■■ Section 108—9 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 108—9) provides:

"In the execution of the warrant the person executing the same may reasonably detain to search any person in the place at the time:

(a)  To protect himself from attack, or

(b) To prevent the disposal or concealment of any instruments, articles or things particularly described in the warrant."

The thrust of the statute is that by virtue of the authority to search the premises, it is sometimes permissible to search persons on those premises.

The statute does not expressly state that the officer must have probable cause to believe one on the premises possesses a weapon or the items described in the warrant. However, the language "reasonably detain to search" suggests that the officer must be prepared to show some reason to suspect that the person on the premises might attack him or attempt to dispose of or conceal items named in the search warrant. (*People v. Dukes* (1977), 48 Ill. App. 3d 237, 363 N.E.2d 62.) An additional requirement, not apparent from the face of the statute but implied by decisional law, is some showing that the person searched have some connection with the premises. *People v. Campbell* (1979), 67 Ill. App. 3d 748, 753, 385 N.E.2d 171; *People v. Dukes.*

In applying this statute to the case at bar, we must also consider the relative timing of the apartment search and defendant's non-voluntary entry. The Committee Comments to section 108—9 recognize that the need for a search usually arises "* * * when the officer first arrives at the place where the goods are to be seized." Further language is also instructive:

> "* * * The need for this power arises most often in the narcotics cases where disposition is most easily effected.
>
> * * *
>
> * * * Furthermore, if a judge decides there is probable cause for issuing the warrant in the first place, then this power given to the officer which is parasitic to the warrant should not be considered excessive in the hands of the executing officer." Ill. Ann. Stat., ch. 38, par. 108—9, Committee Comments, at 271 (Smith-Hurd 1970).

■■ However, to ensure that the power given the executing officer is not excessive, the timing of a search pursuant to the statute must be strictly construed. *People v. One 1968 Cadillac Automobile* (1972), 4 Ill. App. 3d 780, 281 N.E.2d 776.

> "* * * The Statute does not grant to police the power to search someone at their leisure. The need for the search is immediate, and it must be conducted at the earliest opportune moment after the danger presents itself.* * *" 4 Ill. App. 3d 780, 787, 281 N.E.2d 776, 781.

■■ Moreover, the language "may reasonably detain to search" must be strictly construed in light of the teaching of the United States Supreme Court in *Delaware v. Prouse* (1979), ___ U.S. ___, 59 L. Ed. 2d 660, 99 S. Ct. 1391, and *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. *Terry* and *Prouse* indicate that a detention is a "seizure" within the meaning of the fourth amendment even when the purpose of the stop is limited and the resulting detention is quite brief. Accordingly, when defendant and Charles were "invited" into the apartment at gunpoint and made a nonvoluntary entry, their detention constituted a seizure within

the meaning of the fourth amendment. Officers Johnson and Gibson both testified that defendant was not free to leave.

■■■ Classifying defendant's detention as a "seizure" does not end our inquiry, however. The fourth amendment only prohibits unreasonable searches and seizures. The reasonableness, and hence the permissibility, of a particular law enforcement practice is judged by balancing the intrusion on an individual's fourth amendment interests versus promotion of a legitimate government interest. (*Delaware v. Prouse* (1979), ___ U.S. ___, 59 L. Ed. 2d 660, 99 S. Ct. 1391.) In accordance with the teaching of *Terry* and *Prouse*, we construe the language "reasonably detain to search" to require that the executing officer can express at least an articulable and reasonable suspicion that either a search or a detention (or both) is for an enumerated purpose of section 108—9. By this requirement the courts will be provided with a record containing specific articulable facts which, together with rational inferences from those facts, will indicate whether either of the twin functions of section 108—9 is met and, accordingly, whether either the search or the seizure (or both) is reasonable. *Delaware v. Prouse; Terry v. Ohio.*

Applying these principles to the facts of the instant case, we conclude that the seizure and search of defendant were unreasonable and did not comport with the requirements of section 108—9. Initially, strict compliance with the statute only enables detention and search of any person on the premises at the time the warrant is executed. The trial court found that the search had been completed. This finding is supported by Harris' testimony that the search ended 30 to 45 minutes prior to defendant's arrival. Nonetheless, the trial court believed that since the police were still on the premises for the lawful purpose of taking the Harrises into custody, the statute was satisfied. Such an expansive reading of section 108—9, however, contravenes its purpose as indicated by the Committee Comments: The need for a search arises "* * * when the officer first arrives at the place where the goods are to be seized." Ill. Ann. Stat., ch. 38, par. 108—9, Committee Comments, at 271 (Smith-Hurd 1970).

The trial court's belief that *People v. Pugh* (1966), 69 Ill. App. 2d 312, 217 N.E.2d 557, was dispositive was erroneous since that case is distinguishable. In *Pugh*, defendant was admitted at the direction of the officers while the search of the premises was in progress. His detention and search occurred about 15 minutes after the officers entered the apartment and before the officers had discovered any contraband in the apartment. The *Pugh* court further indicated that:

> "* * * We agree with the State that the execution of search warrants in narcotics cases is a risky business at best, and unless the police search all the persons present on the premises they endanger

both themselves and the search they are making. Furthermore, the entry of the defendant onto premises where the police have reason to believe narcotics are concealed provides further grounds for his search. * * *" 69 Ill. App. 2d 312, 316, 217 N.E.2d 557, 559.

The circumstances in the instant case differ since the premises had been thoroughly searched, handguns and narcotics had already been recovered, and the residents had been arrested. The officers' reliance on section 108—9 was not well founded because its purpose had been attained by their successful execution of the warrant and the ensuing arrests. *Pugh* is also distinguishable because there is some indication that Raymond Pugh was the brother of Jessie Pugh, the resident named in the warrant. (See *People v. Campbell* (1979), 67 Ill. App. 3d 748, 750, 385 N.E.2d 171.) Defendant's connection with the premises described in the warrant is not apparent.

The State contends that the requisite connection was established through Harris' testimony that he had known the defendant and Charles for 1 to 1½ years. They had previously visited his apartment and on at least one occasion had been there at 3 to 4 a.m. Clearly, defendant and Charles had a greater connection with the premises than the defendant in *People v. Dukes* (1977), 48 Ill. App. 3d 237, 363 N.E.2d 62. Dukes was an innocent stranger who had mistakenly entered premises being searched. Defendant and Charles were guests and acquaintances of the Harrises. However, the *Dukes* court indicated that connection with the premises may mean more than a social guest:

"[T]he record articulates no facts indicating that the defendant had any connection with the premises described in the warrant. The defendant was not on the premises when the police officers arrived to execute the warrant, nor does it appear that the defendant lived on the premises or was related to anyone who lived there." (48 Ill. App. 3d 237, 240, 363 N.E.2d, 62, 64.)

See also LaFave, *Search and Seizure: Course of True Law*, 1966 U. Ill. L. F. 255, 271-73 (concerning the requirement of connection with the premises). Compare *People v. Campbell* (1979), 67 Ill. App. 3d 748, 385 N.E.2d 171 (defendant, who was a resident of the premises and entered without knocking while police were conducting a search, deemed to have sufficient connection with the premises).

■■ Moreover, the record fails to indicate that the officers knew defendant had sufficient connection with the premises. Johnson testified that Charles was asked who he was, why he was there and whether he lived there. His response, if any, and any questioning of defendant are not of record. Gibson testified that Charles told him he had come to see Carolyn Harris. Even if we accept the officer's testimony in a light most

favorable to the State, defendant was merely a visitor arriving after a completed search. Accordingly, under these circumstances, we find that defendant lacked sufficient connection with the premises to justify her seizure and search.

We turn next to the twin purposes of section 108—9 to review whether the officers complied with the "reasonably detain to search" language of the statute. In other words, we review the record to see if the officers manifested specific articulable facts which, together with rational inferences from those facts, indicated the necessity to protect themselves from attack or to prevent disposal or concealment of contraband described in the warrant.

The State contends that the police reasonably believed that defendant might attack them. They had discovered three handguns in the apartment prior to the arrival of defendant and Charles and had found a weapon on Charles. However, at the point when defendant and Charles were "directed" to enter the apartment, Officer Gibson had his service revolver drawn and pointed. Johnson's testimony, reported above in pertinent part, clearly indicates that he was never in fear for his safety. He explained that he believed he could maintain physical control over defendant so long as he did not turn his back on her. Gibson testified he was apprehensive and cautious because handguns had previously been recovered. Yet, since he had his service revolver drawn, it is apparent that he, too, was in control. Both officers indicated they did not turn their backs on defendant and kept close proximity to her. Defendant made no furtive movements to indicate to the officers that they might be in danger. ■■ Furthermore, in light of the trial court's opinion that Johnson and Gibson were not credibile witnesses, we doubt the validity of their testimony that defendant may have had a gun stored in the crotch of her pants. Johnson indicated that the bulge was pointed and might have been a weapon. Gibson testified the bulge was half-moon shaped and large. In short, we agree with defendant that the officers' testimony concerning the bulge in her crotch area is hardly consistent with the possibility of a concealed weapon. Accordingly, we find the record does not support a finding that the officers reasonably suspected an attack.

Finally, we also conclude that there is no showing that the police reasonably suspected defendant would destroy or conceal items de-scribed in the warrant. The State concedes that the record is silent as to whether either officer believed that defendant possessed any narcotics named in the warrant or might attempt to conceal or dispose of such items. Nonetheless, the State contends there is circumstantial justification for a reasonable belief that defendant was engaged in narcotics activities. Narcotics had been recovered from Carolyn Harris. Defendant and

Charles knew the Harrises and had previously visited them. This visit occurred at about 3 a.m. and the police observed a bulge in defendant's pants.

■■ We do not agree. Defendant was not even on the premises when the officers entered and began their search. When she did enter, the premises had been thoroughly searched, evidence gathered and the perpetrators handcuffed. The Committee Comments indicate that the need to search individuals not listed in the search warrant for items described in the warrant arises when the officers first arrive and execute the warrant. Accordingly, since the warrant had been successfully executed, there was no showing defendant would destroy or conceal items described in the warrant.

■■ ■ For the foregoing reasons, we find the detention to search defendant was unreasonable, and we reverse the order of the circuit court of Cook County denying defendant's motion to quash arrest and suppress physical evidence. Because defendant's arrest is quashed and because the sole evidence against defendant is evidence found as a result of the search, the judgment of conviction must be reversed. *People v. Bowen* (1963), 29 Ill. 2d 349, 194 N.E.2d 316, *cert. denied* (1964), 376 U. S. 927, 11 L. Ed. 2d 622, 84 S. Ct. 690.

Reversed.

McGLOON and CAMPBELL, JJ., concur.