Dear Mr. Wilson:
This official Opinion is issued in response to your inquiry which asked whether Delaware v. Prouse,
___ U.S. ___, 99 S.Ct. ___, 59 L.Ed.2d 660 (1979), limits the authority of water patrolmen to randomly stop "and board any boat during daylight hours for the purpose of making an inspection necessary to determine compliance with the provisions under Chapter 306, RSMo."
Prouse will be discussed in detail anon; however, briefly stated, in that case the United States Supreme Court concluded that police officers may not stop an automobile driver in order to check for compliance with applicable registration and safety regulations unless there is an articulable and reasonable suspicion that some state law is being violated. Although random and arbitrary stops were found unconstitutional, as an unreasonable seizure under the Fourth and Fourteenth Amendments, the Court specifically refrained from precluding States
 ". . . from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers." Id., 59 L.Ed.2d at 673-674. [Footnote omitted.]
The Court reasoned that an individual operating or traveling in an automobile does not lose a reasonable expectation of privacy simply because the automobile and its use are subject to governmental regulation. Id., 59 L.Ed.2d at 673.
The specific question which this opinion will answer is whether water patrolmen may randomly and arbitrarily stop boaters, on the waters of this State, in order to inspect for a violation of any of the regulations found in Chapter 306; and, concomitantly therewith, if such stops are deemed to fall within the ambit of Prouse, what methods may be utilized to check for a violation of Chapter 306.
Section 306.165, RSMo 1978, states, among other things, in its concluding paragraph that: "Each water patrolman may board any boat during daylight hours for the purpose of making any inspection necessary to determine compliance with the provisions of this chapter."
Some of the regulations affecting watercraft, found in Chapter 306, to which § 306.165, RSMo 1978, alludes, are briefly catalogued in the following noninclusive list:
 Section 306.020, RSMo 1978, requires that each boat in this state be numbered; and, that no vehicle be operated without this number displayed upon the boat.
 Section 306.030, RSMo 1978, requires, in pertinent part; (a) that the Department of Revenue issue a certificate of title to the owner of a boat at the same time a number is awarded; (b) that each new vessel sold in Missouri after January 1, 1970, "shall have die stamped on or within three feet of the transom or stern a factory number or serial number"; and (c) that each "certificate of number" awarded be renewed every three years.
 Section 306.040, RSMo 1978, requires that no number other than that awarded to a motorboat pursuant to Chapter 306 may be displayed on either side of the bow of a motorboat.
 Section 306.050, RSMo 1978, requires notification to the Department of Revenue of the transfer, destruction, or abandonment of a registered boat.
 section 306.090, RSMo 1978, describes the maximum sound which may emanate from a boat operating in this state. This section also states when and under what circumstances this maximum may be exceeded.
 Section 306.100, RSMo 1978: (a) defines the classes of boats and the required lights each is to exhibit from sunset to sunrise; (b) prescribes the number and types of wearable personal flotation devices required for each class of boat; (c) requires a specified exhaust system for "every motor boat that is carrying or using inflamable or toxic fluid in any enclosure for any purpose . . ."; (d) mandates the type of fire extinguisher required for each class of boat; (e) requires a sounding device; (f) prohibits the use of any vessel not equipped as provided in this section; and, (g) allows a water patrolman to direct any vessel being operated without sufficient personal flotation devices, fire-fighting devices, or being operated in an overloaded or other unsafe condition, to take whatever immediate and reasonable steps are necessary for the safety of those aboard when, in the judgment of the officer, the above conditions create a hazardous condition.
 Section 306.120, RSMo 1978, sets out the requirements for towing a person on skis or a surfboard.
 Section 306.200, RSMo 1978, states that any peace officer may enforce the provisions of Chapter 306 and arrest the violators thereof.
 Section 306.210, RSMo 1978, prescribes the punishments to be meted out for the violations of any Chapter 306 regulations. Specifically, any violation of §§ 306.020 to 306.070 or 306.090 to 306.150 is deemed a misdemeanor to be punished by a fine of not more than one hundred dollars for each violation. Any violation of § 306.110 is also deemed a misdemeanor and is to be punished by a fine of not more than five hundred dollars or a term in county jail not to exceed six months, or both.
The focus of this Opinion alights upon the applicability,vel non, of Prouse to § 306.165, RSMo 1978, which allows the random stopping of boats on Missouri's waterways by "peace officers" in an effort to insure compliance with Chapter 306. It is, of course, impossible to determine how a court would rule on this precise issue. Accepting as axiomatic our lack of prescience this Office nevertheless concludes that Prouse applies to watercraft and proscribes the random and arbitrary stops thereof. To explain our conclusion a detailed look at Prouse is required.
In Prouse the United States Supreme Court stated that the issue before it was as follows:
 "The question is whether it is an unreasonable seizure under the Fourth and Fourteenth Amendments to stop an automobile, being driven on a public highway, for the purpose of checking the driving license of the operator and the registration of the car, where there is neither probable cause to believe nor reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable law." Delaware v. Prouse, supra,
59 L.Ed.2d at 665.
In Prouse a Delaware police officer stopped an automobile occupied by the respondent. The patrolman smelled marijuana smoke as he was walking toward the stopped vehicle and seized marijuana in plain view on the car floor. The respondent was subsequently indicted for illegal possession of a controlled substance. At a suppression hearing the police officer testified that he had observed neither traffic or equipment violations nor any suspicious activity previous to stopping the respondent; indeed, the patrolman stated that he made the stop only in order to check the driver's license and registration. The United States Supreme Court affirmed the ruling of the Delaware Supreme Court suppressing the marijuana seized because it flowed from an unconstitutional seizure.
Dispositively, the Supreme Court found that the Fourth and Fourteenth Amendments were implicated
 ". . . because stopping an automobile and detaining its occupants constitute a `seizure' within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention quite brief. [Citations omitted.] The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of `reasonableness' upon the exercise of discretion by government officials, including law-enforcement agents, in order `"to safeguard the privacy and security of individuals against arbitrary invasions. . . ."' [Citations omitted.]" Id., 59 L.Ed.2d at 667. [Footnotes omitted.]
Delaware argued that its police officers should be subject to no constraints in deciding which automobiles to stop for license and registration checks because the State's interest in discretionary spot checks as a means of insuring the safety of its roadways outweighed the resulting intrusion on the privacy and security of the persons detained. The Court found this argument insufficient, stating:
 "We agree that States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed. Automobile licenses are issued periodically to evidence that the drivers holding them are sufficiently familiar with the rules of the road and are physically qualified to operate a motor vehicle. The registration requirement and, more pointedly, the related annual inspection requirement in Delaware are designed to keep dangerous automobiles off the road. Unquestionably, these provisions, properly administered, are essential elements in a highway safety program. Furthermore, we note that the State of Delaware requires a minimum amount of insurance coverage as a condition to automobile registration, implementing its legitimate interest in seeing to it that its citizens have protection when involved in a motor vehicle accident.
 "The question remains, however, whether in the service of these important ends the discretionary spot check is a sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests which such stops entail. On the record before us, that question must be answered in the negative. Given the alternative mechanisms available, both those in use and those that might be adopted, we are unconvinced that the incremental contribution [sic] to highway safety of the random spot check justifies the practice under the Fourth Amendment.
* * *
 ". . . Many violations of minimum vehicle safety requirements are observable, and something can be done about them by the observing officer, directly and immediately. Furthermore, in Delaware, as elsewhere, vehicles must carry and display current license plates, which themselves evidence that the vehicle is properly registered; and, under Delaware law, to qualify for annual registration a vehicle must pass the annual safety inspection and be properly insured. It does not appear, therefore, that a stop of a Delaware-registered vehicle is necessary in order to ascertain compliance with the State's registration requirements. . . .
 "The marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure — limited in magnitude compared to other intrusions but nonetheless constitutionally cognizable — at the unbridled discretion of law enforcement officials. To insist upon neither an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion `would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial that inarticulate hunches. . . .' . . .
* * *
 "An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation. . . . Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. . . .
 "Accordingly, we hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." Id., 59 L.Ed.2d at 670-671, 672, 673.
In our opinion the above quotation conclusively establishes the similarity between random spot checks of an automobile driver and random spot checks of watercraft operators to determine compliance with the safety regulations of Chapter 306. We believe that the previously quoted provisions in Chapter 306 serve the same functions as the traffic regulations in Prouse which were deemed insufficient to authorize random intrusions to ensure their compliance. Since we believe that the sole purpose of allowing water patrolman to board any boat during daylight hours to check compliance with Chapter 306 is to insure the safety of the boating public, the United States Supreme Court's conclusion that the Fourth Amendment precludes random stops of land traffic should apply to watercraft as well. Certainly, the operator of a watercraft does not have his Fourth Amendment right diminished solely because he is operating a craft on water rather than upon land. Self-evidently, the analogies between landcraft and watercraft are obvious and overwhelming and their differences, equally axiomatically, minimal and inconsequential.
Consequently, we conclude that Prouse abjures any implication in § 306.165, RSMo 1978, to the effect that random spot checks are authorized. Nevertheless, before determining what type of checks may be permissible a statutory "roadblock" must be overcome.
Section 306.165 states that a water patrolman shall have all the power of a peace officer to enforce all laws of this state ". . . except for search and seizure. . . ."
In Prouse the Court determined that the mere stopping of land vehicle only to check for safety or registration violations, which stop presumably would be of short duration, is a seizure within the meaning of the Fourth Amendment. Hence, Prouse calls the stopping of an automobile a "seizure" and by law Missouri water patrolmen may not lawfully engage in a "seizure." This apparent conflict is superficial. Since by law Missouri water patrolmen may stop and board watercraft in order to ascertain compliance with Chapter 306, it is clear that the Missouri legislature only meant to proscribe the "seizure" of items. Thus, although Prouse
calls the stopping of a vehicle a "seizure" we believe that when the Missouri legislature did not give water patrolmen the power of "search and seizure" the legislature used the word "seizure" in a context different than that before the Court in Prouse. Consequently, although water patrolmen do not have the power of "search and seizure" they are empowered to stop boats for inspection, in a manner to be elucidated anon, and this power remains unimpaired by Prouse.
It is our understanding that water patrolmen may establish watercraft inspection check points on the waters of this state and inspect each boat for violations of Chapter 306. If such inspection check points are found to be unduly burdensome and the boating public subjected to inordinate delays we believe, based upon the concurring opinion of Justice Blackmun, ". . . that the Court's reservation also includes other not purely random stops (such as every 10th car to pass a given point) that equate with, but are less intrusive than, a 100% roadblock stop." Id.,59 L.Ed.2d at 674. Thus, we believe that an inspection check point where every 10th boat, for example only, is inspected would be constitutionally permissible.
CONCLUSION
Therefore, it is the opinion of this office that water patrolmen may not, randomly and arbitrarily stop a watercraft, without "reasonable suspicion," in order to inspect that boat for compliance with the regulations found in Chapter 306, RSMo. However, water patrolmen may set up an inspection check point for inspection of watercraft.
The foregoing opinion, which I hereby approve, was prepared by my Assistant, Michael Hillel Finkelstein.
Yours very truly,
 JOHN ASHCROFT Attorney General