THE STATE OF OHIO, APPELLEE, *v.*
WILLIAMS, APPELLANT.

(No. 1451—Decided
November 3, 1988.)

*Richard G. Ward,* prosecuting attorney, and *Christine Henthorne,* for appellee.

*William H. Allyn, Jr.,* for appellant.

GREY, P.J. This is an appeal from a judgment of the Ross County Court of Common Pleas accepting appellant Richard A. Williams' negotiated plea of no contest to receiving stolen property, in violation of R.C. 2913.51. Williams was sentenced to serve a term of from two to five years' imprisonment in the Ohio Penitentiary. Williams appeals the trial court's denial of his motion to suppress. We reverse.

The record reveals the following facts. In the early morning hours of May 13, 1987, a body shop in Chillicothe, Ohio, was burglarized. A van similar to Williams' van was seen in the vicinity of the body shop around the time of the break-in.

Around 4:30 a.m., Williams' van was spotted by the police parked in a McDonald's parking lot, but Williams was not around. Chillicothe Police Officer Weatherbee and Deputy Sheriff Stanhope looked into the windows of the van and saw a floor jack and other items which might have come from the break-in. Mr. Sommers, owner of the shop, came to the lot and also looked into the window, but he stated that he did not know if the items were his.

The van was placed under surveillance by Officer Weatherbee. Some time later Williams approached Weatherbee and said that he did not have a driver's license, but that he had called Connie Hawk, a friend in Columbus, to come down and drive the van away. Weatherbee asked Williams if he would consent to a search of the van, but Williams refused. Weatherbee then told Williams that the van was in an unsafe condition because it had bald tires and a missing wiper blade. Officer Weatherbee, who went off duty around 6:45 a.m., testified as follows at the suppression hearing:

"Q. But you got the impression that a vehicle matching that description was seen near that break-in?

"A. Yes, sir.

"Q. Okay. The officers were acting as if they had probable cause to believe that that vehicle was used in that break-in?

"A. Yes, sir.

"Q. Okay. Did you and the officers ever discuss going and getting a search warrant?

"A. I didn't. I had very little to do with the case, sir."

When his shift ended, Weatherbee was replaced by Deputy Stanhope, who continued the stake-out. Stanhope testified:

"I was watching the van waiting to see what the city police were going to

do with the situation. They didn't advise me whether they were going to get a search warrant, what their progress in the investigation was. If they discontinued watching the van as the body shops in the county and the area opened up, it was my indication—or my intention to continue to watch the van in case another break-in was reported. It had appeared to me that items in that van I saw on the lot came from a body shop. Mr. Sommers had come to the lot and said he wasn't sure what was missing from his body shop. He didn't know if the items that he saw in the. van were his. My intention was to watch the van. As businesses opened up, if something was reported, I would know where that van was.

"Q. So you were going to follow the van if it moved?

"A. I was going to follow it until it left the county. That's right."

When Connie Hawk arrived, she drove Williams and his van out of the McDonald's parking lot. Soon after the van pulled out on Route 23, Deputy Stanhope stopped the van, claiming the van was being driven erratically because the steering linkage was loose.

Stanhope had Williams' van towed to Mount Logan Motors. Williams was waiting at Mount Logan Motors when Stanhope arrived and explained to Williams what needed to be done to get the van to meet the prescribed safety standards. Williams asked Stanhope if he could make the repairs himself and then went a short way down the street to make a phone call.

Stanhope called Sommers to come to Mount Logan Motors. Upon Sommers' arrival, Stanhope began what he characterized as "an inventory search" on the van, and Sommers identified property which had come from his body shop.

As noted, Williams was indicted on a charge of receiving stolen property, in violation of R.C. 2913.51. Williams pleaded not guilty, but then during the trial changed his plea to "no contest."

Williams appeals and assigns one error:

"The trial court erred in overruling the defendant's motion to suppress evidence obtained as the result of an illegal search and seizure."

Williams' basic premise in this appeal is that all evidence of the stolen property should have been suppressed because the search conducted by Deputy Stanhope was not a valid inventory search, but, rather, a warrantless, unreasonable pretext search in violation of the Fourth Amendment. We agree.

It is axiomatic that the Fourth and Fourteenth Amendments to the United States Constitution protect citizens against warrantless searches and seizures. The stopping of an automobile on a public highway is a "seizure" as defined within the purview of those amendments. *Delaware v. Prouse* (1979), 440 U.S. 648, 653.

Originally, a warrantless search or seizure was reasonable and justified only if accompanied by a showing of probable cause. *Chambers* v. *Maroney* (1970), 399 U.S. 42, 51; *Michigan* v. *Thomas* (1982), 458 U.S. 259, 261. In addition, the Supreme Court has determined that an inventory search of a vehicle after a lawful arrest or stop is valid pursuant to the Fourth Amendment. *South Dakota* v. *Opperman* (1976), 428 U.S. 364. The *Opperman* court also indicated that such a search is valid only if it was not done as a pretext for a warrantless evidentiary search.

Here, the facts reveal that Williams' van was under surveillance for over three hours, sufficient time in which to seek and obtain a valid search warrant. Instead, however, the authorities decided not to seek a warrant, but to conduct a pretext "inventory" search of Williams' van.

The purpose of an inventory search is "aimed at securing or protecting the car and its contents." *Opperman, supra,* at 373. The facts in this case indicated security or protection was a pretext since Williams was in the very near vicinity of his vehicle and since Sommers was called to be present to identify the evidence. It is clear from the record that the search done on Williams' vehicle was one to gather evidence and not to take an inventory. The controlling Ohio case on this matter is *State* v. *Caponi* (1984), 12 Ohio St. 3d 302, 12 OBR 375, 466 N.E. 2d 551, certiorari denied (1985), 469 U.S. 1209. In *Caponi,* the Ohio Supreme Court held:

"A search which is conducted with an investigatory intent, and which is not conducted in the manner of an inventory search, does not constitute an 'inventory search' and may not be used as a pretext to conduct a warrantless evidentiary serach." *Id.* syllabus.

The facts here, specifically the fact that the officer failed to seek a search warrant although having ample time to do so, compel the conclusion that the search of this vehicle was conducted solely with investigatory intent. Thus, the search was not a valid inventory search as defined in *Opperman, supra,* but rather one as discussed in *Caponi, supra.*

The evidence in Williams' van was seized in contravention of the Fourth and Fourteenth Amendments and should have been suppressed. The trial court erred in not doing so. Williams' assignment of error is well-taken and is sustained.

*Judgment reversed.*

ABELE and STEPHENSON, JJ., concur.