OPINION OF THE COURT
Leonard P. Rienzi, J.
Defendant moves to suppress physical evidence. A hearing was held before me on October 16 and October 20, 2006. Two witnesses testified, Detective John Duffy of the Staten Island Robbery Squad and Lieutenant David Nilson, Commanding Officer of the 120th Precinct Detective Squad. I found both witnesses to be credible. I find the following facts.
During the afternoon of January 19, 2006, a home invasion burglary/robbery occurred at 42 Lake Avenue in Staten Island. The defendant was the victim of that crime. A number of individuals wearing masks forced their way into defendant’s home at gunpoint. One of the robbers shot the defendant in the head during the commission of the crime. The robbers stole a safe from defendant’s home.
When the police responded to the scene, defendant was found to be seriously injured and was considered by the police to be “likely to die.” He was rushed to the hospital. While investigating the crime scene, the police found a quantity of marijuana and what appeared to be cocaine. Rather than proceed with a warrantless search, Lieutenant Nilson, the supervising detective at the scene, obtained a search warrant for the defendant’s home.
As the police were conducting their investigation at the scene, a witness reported that she had seen two men wearing masks running from the area of defendant’s home into the rear yard of a nearby home at 83 Lake Avenue. The men were seen carrying a dark colored box.
Police Officer Lavignara responded to the rear yard of 83 Lake Avenue. He observed a safe under the deck in the backyard. On the deck above the safe he observed a handgun secreted inside a baby carriage. In close proximity to the carriage, he observed a pair of rubber gloves similar to those utilized at hospitals.
Based on the totality of circumstances surrounding its discovery, Lieutenant Nilson, the commanding officer of this investigation, concluded that the safe was the proceeds of the home invasion burglary/robbery in which defendant Rodriguez had been shot in the head. Lieutenant Nilson ordered that the *984 safe be opened and its contents inventoried and vouchered. No consent was sought. No search warrant was obtained. Earlier, the police department emergency services unit had responded to the crime scene and 83 Lake Avenue. Since emergency lighting had been set up in the rear yard of 83 Lake Avenue to further the investigation and search of the area, and since the emergency services unit possessed the expertise to open the safe, it was opened at 83 Lake Avenue, rather than removed to the precinct. Prior to opening the safe, its outside was dusted for fingerprints. Upon opening the safe, the police found approximately nine ounces of cocaine, $17,900 in cash and a loaded .45 caliber firearm. At the time the safe was opened, “there was never any question that that safe had been removed from 42 Lake [Avenue].” (Hearing minutes, Oct. 16, 2006, Detective Duffy, at 14.) The contents of the safe were likewise dusted for fingerprints. Defendant’s fingerprints were found on an object inside the safe.
The safe was opened by the police in the course of searching for physical evidence and the masked, armed perpetrators of a home invasion burglary/robbery in which the victim had been shot in the head and was considered “likely to die.” The totality of the circumstances including: (1) the time of the crime; (2) the location of the crime; (3) the nature of the crime; (4) the observation of masked men fleeing the crime scene, carrying an object, entering a nearby yard; (5) the location of the safe under the deck in the yard; (6) the observation of a gun and gloves in close proximity to the safe, all when taken together supported the conclusion of the police that the safe was stolen property, the proceeds of the home invasion burglary/robbery in which the victim had been shot in the head. The well-founded and virtually inescapable police conclusion that the safe was stolen property transported by armed fleeing gunmen from the crime scene amply supported Lieutenant Nilson’s decision to take possession of, voucher and inventory both the safe and its contents. At the time the safe was located, it was unknown whether the victim of the robbery would survive the gunshot wound to the head. Likewise unknown was the whereabouts of the armed gunmen who had shot him in the head. Also unknown was whether the safe was open or closed when the armed robbers removed it from the victim’s home. The totality of the circumstances — including the fact that the armed robbers, who had just shot a victim in the head, were still at large — provided ample support for the police to “reasonably conclude that the *985 [safe] contained items requiring discovery and inventory and their conduct in opening and securing it was reasonable” (People v Gonzalez, 62 NY2d 386, 391 [1984]). The fact that crime scene officers dusted both the outside and safe contents for fingerprints demonstrates the reasonableness of police conduct during the early hours of a manhunt for armed, masked robbers who might possibly have committed a homicide. The police had a clear obligation to secure, examine, voucher and inventory the safe and its contents which constituted stolen property, physical evidence and the proceeds of a heinous crime, proceeds which had recently been abandoned by armed robbers who were still at large. Whether the safe was open or closed while inside the defendant’s home was unknown. Whether the robbers had stolen a locked safe or had filled an open safe with additional loot from the robbery scene was unknown. Whether the fingerprints of one or more robbers would be found inside or outside the safe was unknown. While the robbers were at large and the police in hot pursuit, the prompt administrative action taken by the police in close proximity to the crime scene during the immediate aftermath of this vicious crime was both reasonable and responsible.
The seizing, inventorying and vouchering of the safe and its contents constituted an “incidental administrative step” (Illinois v Lafayette, 462 US 640, 644 [1983]), following the discovery of apparently stolen property abandoned by armed robbers while fleeing the scene of the crime.
“The standard of reasonableness to be applied to such administrative searches is that found in the [Supreme Court’s] decision in Delaware v Prouse (440 US 648) which requires that the courts balance the intrusion of the search on the individual’s Fourth Amendment interests against its promotion of legitimate governmental interests (id., at p 654).” (People v Gonzalez, 62 NY2d 386, 390 [1984].)
The fact that there were no clearly delineated administrative guidelines for the seizure, examination, inventorying and vouchering of evidence for the precise situation confronting the police does nothing to detract from the inherent reasonableness which motivated and permeated their conduct. Lieutenant Nilson confirmed that according to the New York City Police Department Patrol Guide, closed containers may be opened and contents inventoried during the vouchering process and that locked containers may be forced open if it can be done with minimal damage. (Hearing minutes, Oct. 23, 2006, Lieutenant *986 Nilson, at 30-31.) According to Lieutenant Nilson, “We always use minimal damage to open up a safe.” (Id. at 31.) Defendant offered no testimony at the hearing to establish the degree of damage, if any, done to the safe in the course of it being opened.
Nor should the police be penalized and evidence suppressed based on the failure of the police to take the safe to the precinct before the vouchering and inventorying took place. In this rapidly unfolding scenario, time was of the essence, and the utilization of trained emergency service officers, who were already on the scene, to examine the safe and its contents without unnecessary delay was an intelligent and eminently reasonable response to the situation at hand. Since the safe was clearly stolen property discovered by the police, it was proper for them to inventory and voucher its contents. (See, People v Williams, 173 AD2d 863, 664 [2d Dept 1991].) Nor were the police required to devote hours to obtaining a search warrant and to seek the “least intrusive means for administering neutral and routine procedures” (People v Gonzalez, 62 NY2d 386, 390 [1984], supra). A search warrant was not necessary for the administrative actions by the police. Nor would it make sense to unnecessarily delay the hot pursuit of the armed robbers while obtaining a superfluous search warrant. The fact that the police obtained a search warrant after seeing contraband inside defendant’s home demonstrates their sensitivity to legitimate Fourth Amendment concerns and their willingness to obtain search warrants when such were necessary. While defendant maintained a property interest in the safe and its contents, defendant’s privacy interest was destroyed by the robbers in taking the safe from him and abandoning it in a location in their immediate path of flight where a police investigation was focused. “[T]he existence of a property interest does not mean that defendant also had a privacy interest protectable by the State and Federal guarantees against unreasonable searches and seizures.” (People v Natal, 75 NY2d 379, 383 [1990].) While defendant, assuming he had locked the safe in his home, may have had a subjective expectation of privacy in its contents, that expectation of privacy ceased to be reasonable, that is, “justifiable under the circumstances” (see, People v Ramirez-Portoreal, 88 NY2d 99, 108 [1996]). The totality of the circumstances, including the asportation of the safe by the robbers, and its abandonment on their path of flight from the crime scene, rendered objectively unreasonable any expectation of defendant that his privacy interest in the contents of the safe would continue unabated. Upon finding the *987 safe, the police conduct in taking possession, examining, inventorying and vouchering the safe and its contents constituted reasonable and relatively routine police administrative action for which defendant, under the totality of circumstances present in this case, lacks standing to complain.
Defendant’s motion to suppress is denied.