**UNITED STATES of America,
Plaintiff,**

**v.**

**Jesse James TIBBETTS, Defendants.**

**No. 2:03cr00168.**

United States District Court,
D. Utah,
Central Division.

Feb. 10, 2004.

Scott Keith Wilson, Salt Lake City, UT, Charles L. Hawkins, Minneapolis, MN, J. Bryan Jackson, Cedar City, UT, David O. Leavitt, Salt Lake City, UT, Richard Sand, St. Paul, MN, for Defendant.

Veda M. Travis, U.S. Atty., Salt Lake City, UT, for U.S.

## ORDER AND OPINION

BENSON, District Court.

### INTRODUCTION

Before the Court is Defendant Jesse James Tibbets' Motion to Suppress Evidence. Oral argument pertaining to Tibbetts' Motion was heard on July 21, 2003. Tibbetts is challenging the admissibility of evidence obtained during the stop of the motor vehicle he was driving.

### FACTS

Sgt. Jeff Chugg[1], a K–9 Sargent with the Utah Highway Patrol and a member of the special operations interdiction team and his K–9, Claudio, were sitting stationary in the median of Interstate 80 on January 7, 2003, observing eastbound traffic when Sgt. Chugg observed a Toyota 4Runner traveling eastbound. As the vehicle passed, Sgt. Chugg noticed something gleaming off of what appeared to be the windshield. Sgt. Chugg decided to pull out and follow the vehicle to get a better view. After having positioned himself for a better view, Sgt. Chugg was able to observe what appeared to be a silver necklace hanging from the rear-view mirror and also what appeared to be a series of wires that came from the driver's side door across the windshield in front of the driver's line of sight.

Sgt. Chugg believed the objects to be a distraction to the driver's vision in violation of the Utah Traffic Code. Sgt. Chugg further observed that the 4Runner appeared to have after market tires which were wider than the factory mudguards. Sgt. Chugg believed that because the mudguards did not fully cover the tires the driver was violating the Utah Traffic Code. Sgt. Chugg made various other observations regarding the vehicle, including the positioning of the cargo in the rear of the vehicle which raised Sgt. Chugg's suspicions of drug trafficking.[2]

Sgt. Chugg ran a license plate check on the vehicle, which had a California license plate. The plate check showed the vehicle was registered to a woman named Anita Tapia. Sgt. Chugg observed that the vehicle was occupied by two men. Sgt. Chugg then stopped the vehicle and made contact with the driver, Jesse James Tibbetts. While conversing with Tibbetts, Sgt. Chugg noticed a strong odor of what he believed was air freshener and laundry detergent. Based on his training, Sgt. Chugg associated the odors with those commonly used to conceal the odor of narcotics.

Sgt. Chugg explained that he had pulled Tibbetts over because the silver necklace hanging from the rear view mirror was causing a glimmer. Tibbetts removed the necklace from the rear view mirror. Sgt. Chugg then requested that Tibbetts produce a driver's license, registration and proof of insurance. Sgt. Chugg noticed Tibbetts' hands were shaking as he handed him the documentation. Sgt. Chugg also observed that both Tibbetts and his passenger, Christopher Doherty, appeared very nervous. Sgt. Chugg inquired re-

---

1. Sgt. Chugg has been with the Utah Highway Patrol for ten years and a member of the interdiction team for the past two years. The interdiction team to which he belongs focuses on criminal activity involving drug smuggling. Sgt. Chugg has received specialized training in narcotics interdiction, including training with Operation Pipeline. During his time with Utah Highway Patrol Chugg has made more than 2,300 drug arrests.

Sgt. Chugg's K–9 Claudio is a Belgian Malinois and has received specialized training in narcotics detection and patrol.

2. Sgt. Chugg noticed a gas powered scooter sitting on top of the load, which was peculiar to him because of the potential for spilling gas on the items below. He also noticed a floor fan, which struck him as odd because of the time of the year.

garding the ownership of the car and Tibbetts responded that it belonged to his girlfriend Anita.

Once Sgt. Chugg had the vehicle documentation he requested that Tibbetts come with him to his patrol car. Sgt. Chugg asked Tibbetts some questions regarding Anita, the registered owner. Tibbetts informed Sgt. Chugg that Anita was his girlfriend and that they had a child together. Tibbetts then informed Sgt. Chugg that Anita and his child were in Tahoe and that he had been visiting them for the New Year's holiday. Tibbetts also stated that he had spent the Christmas holiday with his family in Minnesota and that he and Doherty had driven to California in a 1957 Cadillac. Tibbetts stated that he invited Doherty because of the long drive.

Tibbetts informed Sgt. Chugg that although he and Anita were separated, he was now driving to Minnesota to meet her. Tibbetts explained that Anita and her daughters were leaving her sister's home and flying that same day from California to Minnesota. Tibbetts also told Sgt. Chugg that he was supposed to meet Anita that afternoon in Minnesota, even though he was still 18–24 hours from Minneapolis and did not know the airline Anita would be using.

Tibbetts could not provide Sgt. Chugg with Anita's sister's phone number or address and he also told Sgt. Chugg that Anita did not have a cell phone. During their conversation Tibbetts remained nervous, constantly licking his lips and swallowing. The vehicle registration indicated that Anita lived in Yuba City, California. Tibbetts informed Sgt. Chugg that Anita was not currently residing in Yuba City, but rather in west Sacramento.

Tibbetts then informed Sgt. Chugg that his desire was that Anita and his child would be with him in Minnesota. He then told Sgt. Chugg that he and Anita did not get along very well. Sgt. Chugg thought it

strange that Tibbetts was unable to produce Anita's phone number. He also found it strange that Tibbetts did not know Anita's sister's name or address, based on Tibbetts' representation that he and Anita had a child together and because he was driving her vehicle. Sgt. Chugg found many of Tibbetts' answers to be implausible.

Sgt. Chugg requested that Tibbetts remain in his patrol vehicle while he made contact with Doherty, the passenger, to confirm Tibbetts' answers to his questions. Sgt. Chugg asked Doherty about Anita to which he responded that Anita was Tibbetts' girlfriend and the two had been visiting her at her home in Yuba City, California. Doherty did not have any knowledge regarding Anita's flight to Minneapolis later that day. Sgt. Chugg then asked Doherty how he knew Tibbetts. Doherty hesitated in responding, but finally indicated that the two had met at a mechanic's garage. Sgt. Chugg's suspicions were not quelled at that point and his questioning continued. Sgt. Chugg asked Doherty if the vehicle contained money or drugs. Doherty told him no. Sgt. Chugg then asked if he could search the vehicle. Doherty told him that it was not his car and that he could not consent to a search.

Sgt. Chugg then returned to the patrol car to speak with Tibbetts. Sgt. Chugg asked Tibbetts if he knew his passenger's last name. Tibbetts did not know it, but said that he would remember it if he heard it. Tibbetts told Sgt. Chugg that Doherty had wrestled against Tibbetts' brother. Tibbetts then stated that his brother had introduced him to Doherty while they were at a friend's house.

Sgt. Chugg then began to question Tibbetts again about the vehicle. Sgt. Chugg asked Tibbetts if he was planning to return the vehicle to California. Tibbetts said "hopefully" but then stated that he

hoped Anita would stay with him in Minnesota. Sgt. Chugg asked about the Cadillac Tibbetts had driven to California. Tibbetts told Sgt. Chugg that he did not have the Cadillac because it was being reupholstered. Sgt. Chugg asked Tibbetts if he had left the Cadillac for Anita to drive to which Tibbetts responded that he had not because the Cadillac was still in the shop.

Sgt. Chugg then asked Tibbetts if the vehicle contained money or drugs and Tibbetts responded that it did not. Sgt. Chugg then asked if he could search the vehicle and Tibbetts stated "I don't care." During Sgt. Chugg's search of the vehicle Tibbetts never requested that he stop searching nor did he limit Sgt. Chugg's search. Ultimately, Sgt. Chugg discovered a large quantity of marijuana.

## DISCUSSION

■ Tibbetts argues that Sgt. Chugg did not have a reasonable, articulable suspicion of criminal activity sufficient to justify the traffic stop of Tibbetts' vehicle on January 7, 2003. The Court employs a two-step inquiry when determining the constitutionality of a traffic stop under the Fourth Amendment. First, the Court considers " 'whether the officer's action was justified at its inception.' " *Id.* (quoting *United States v. Gonzalez–Lerma*, 14 F.3d 1479, 1483 (10th Cir.1994)). Second, the Court determines " 'whether the action was reasonably related in scope to the circumstances that first justified the interference.' " *Id.* (quoting *Gonzalez–Lerma*, 14 F.3d at 1483). When evaluating the reasonableness of the initial stop, the Court's "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *United States v. Botero–Ospina*, 71 F.3d 783, 787 (10th Cir.1995) (citing *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979)). In essence, the officer must have observed a traffic violation or have a reasonable articulable suspicion that a traffic violation has occurred or is occurring. *Id.*

■ In order to satisfy these requirements the peace officer must have a correct understanding of the law. The officer and the United States must also be able to present facts which clearly support the traffic stop. In the present matter the United States argues that Sgt. Chugg met the reasonableness test by articulating what he believed to be three traffic violations. First, Sgt. Chugg viewed what appeared to be a glimmer coming from the windshield; second, Sgt, Chugg observed what appeared to be wires crossing the windshield; and third, the mudguards on the vehicle did not cover the width of the tires. Sgt. Chugg also observed the peculiar placement of items in the cargo area of the vehicle which triggered suspicions of drug trafficking.

The Court finds that the legitimacy of the traffic stop is unsupported by the present state of the record. From the facts presented through Sgt. Chugg, the sole witness at the suppression hearing, the Court is unable to find as a matter of fact that the defendant's vehicle was pulled over for enforcement of Utah's traffic laws. Rather, the facts support a finding that the vehicle was stopped for the purpose of pursuing a drug investigation, a purpose for which there was insufficient evidence to allow the stop.

Even if the Court were to find that the initial stop was based on a legitimate belief that the state's traffic laws were being violated, the Court is compelled under the state of the record to conclude that Sgt. Chugg's subsequent behavior was not "reasonably related in scope to the circumstances that first justified the interference." *Gonzalez–Lerma* 14 F.3d at 1483.

Sgt. Chugg stated that once he effected the traffic stop, he explained the reason for the stop to Tibbetts. Tibbetts, who according to Sgt. Chugg was very accommodating, immediately removed the silver necklace from the rear view mirror to eliminate the glimmer problem. These facts lead the Court to assume that Sgt. Chugg only discussed the glimmering silver necklace with Tibbetts. The record is silent whether any other explanation of any kind was given to Tibbetts for the traffic stop.

Once Tibbetts removed the silver necklace, Sgt. Chugg admits that he became distracted by a strong odor coming from the car,[3] which led him to believe that the vehicle was being used to transport drugs. From that point forward, Sgt. Chugg failed to address with Tibbetts any of the other alleged traffic violations that he allegedly observed. Sgt. Chugg did not discuss the wiring across the windshield, which he allegedly believed to be in violation of Utah law. Nor did he address in any manner whatsoever the possible mudguard violation. Even if Sgt. Chugg was correct in his assertion that the wiring across the windshield and the inadequacy of the mudguards constituted traffic violations, his failure to address these issues with Tibbetts causes the Court to question the United States' position that the these were genuine reasons for the traffic stop. It is apparent that Sgt. Chugg focused virtually immediately after stopping the vehicle not on possible traffic violations but rather on the possibility that the vehicle was being used for drug trafficking.

In an attempt to legitimize the stop, Sgt. Chugg alleges that he called Tibbetts back to his patrol car to issue him a warning for traffic violations. However, Sgt. Chugg never issued a warning citation. Nor is there any evidence in the record before the Court to even indicate the ground or grounds on which the warning citation would have been based. As previously stated Sgt. Chugg did virtually nothing to corroborate his observations of traffic violations once he had effected the traffic stop. The Court therefore finds that the factual chain of events leading up to and during the traffic stop do not reach the threshold requirement of reasonableness with respect to a legitimate stop based on observed traffic violations.

These factual findings aside, the Court finds that Sgt. Chugg's and the United States' reliance on statutory law is also misplaced. The United States argues that Sgt. Chugg's traffic stop was justified under Utah Code Section 41–6–149(1)(c). This portion of the traffic code supports the assertion that the glimmer of the silver necklace hanging from the rear view mirror constituted a traffic violation. The Court finds this assertion to be erroneous. The specific language of this section of code does not justify Sgt. Chugg's stop. The relevant portion reads as follows:

> 41–6–149. Windshields and windows—Tinting—Obstructions reducing visibility—Wipers—Prohibitions.
>
> (1) Except as provided in Subsections (2) and (3), a person may not operate a motor vehicle with:
>
> (c) any windshield or window that is composed of, covered by, or treated with any material or component that presents a metallic or mirrored appearance

The silver necklace, which apparently caused the glimmer, does not fall within the parameters of section (c). The silver necklace is not a windshield nor window that is composed, covered by or treated with any metallic component. Nor does

---

**3.** At the suppression hearing Sgt Chugg stated the following regarding the odor: "Once I smelled what I smelled in the car my mind kind of went south on some things. I will freely admit that." (Transcript of Suppression Hearing pg. 62 lines 1–2).

the statute address the legality of hanging items from the rear view mirror. The Court finds as a matter of law that this portion of the code does not support Sgt. Chugg's assertion that the silver necklace violated the Utah Code.

The United States further argues that Sgt. Chugg's observation of what appeared to be wiring crossing the windshield constituted a violation of section 41–6–149(1)(d). This portion of the Utah Code reads as follows:

(1) Except as provided in Subsections (2) and (3), a person may not operate a motor vehicle with:

(d) any sign, poster, or other nontransparent material on the windshield, sidewings, or side windows of the motor vehicle except:

(i) a certificate or other paper required to be so displayed by law; or

(ii) the vehicle's identification number displayed or etched in accordance with rules made by the department.

The United States' attempt to use this section of the Utah Code to justify Sgt. Chugg's traffic stop is unpersuasive. Neither Sgt. Chugg's testimony at the hearing nor the United States in its brief have supplied the Court with sufficient evidence to justify a finding that this portion of the Utah Code was violated. Sgt. Chugg never addressed the wiring with Tibbetts at the time of the stop and the United States never addressed the wiring during the questioning of Sgt. Chugg at the suppression hearing. The Court finds as a matter of law that this portion of the Utah Code was not violated based on the present state of the record.

The United States finally argues that Sgt. Chugg had an articulable suspicion that a traffic violation was occurring based on his belief that the vehicle was in violation of section 41–6–150.10, which pertains to mudguards or flaps. This portion of the Utah Code reads as follows:

41–6–150.10. Mudguards or flaps at rear wheels of trucks, trailers, truck tractors, or altered motor vehicles—Exemptions.

(1) The definitions in Section 41–6–148.29 apply to this section.

(2) (a) Except as provided in Subsections (3) and (4), when operated on a highway, the following vehicles shall be equipped with wheel covers, mudguards, flaps, or splash aprons behind the rearmost wheels to prevent, as far as practicable, the wheels from throwing dirt, water, or other materials on other vehicles:

(i) a vehicle that has been altered:

(A) from the original manufacturer's frame height; or

(B) in any other manner so that the motor vehicle's wheels may throw dirt, water, or other materials on other vehicles

(3) Wheel covers, mudguards, flaps, or splash aprons are not required if the motor vehicle, trailer, or semitrailer is designed and constructed so that the requirements of Subsection (1) are accomplished by means of fenders, body construction, or other means of enclosure.

The Court finds that even if this section of the Utah Code was violated, there is nothing in the briefs nor the transcript of the hearing to justify such a finding. Once Sgt. Chugg effected the traffic stop, his reasonable, articulable suspicion regarding the mudguard violation was nullified because of his failure to address the issue with Tibbetts. Had Sgt. Chugg discussed the alleged violation with Tibbetts, or taken the time to walk with Tibbetts to the rear of the vehicle to illustrate the alleged violation, Sgt. Chugg's traffic stop may have been legitimate. However, it is apparent Sgt. Chugg focused solely on the possibility of apprehending drug traffick-

ers and not on the initial alleged traffic violations. The Court finds therefore as a matter of law that this portion of the Utah Code does not support Sgt. Chugg's traffic stop.

## SUMMARY AND CONCLUSION

Based on the foregoing the Court finds that the present state of the record does not reach the threshold requirement of reasonableness to support the traffic stop from the inception, or its continuation. While it is clear under the present state of the law in the Tenth Circuit that a police officer may stop a motorist because the officer has a reasonable suspicion that "any one of the multitude of applicable traffic and equipment violations of the jurisdiction is being violated,"[4] it is still required at a minimum that the traffic violation be given some degree of attention once the motorist and his vehicle have been detained. Based on the record in this case, once the officer smelled the air freshener the roadside encounter was solely a search for drugs. The request for the driver to move to the patrol car was only a tactic to separate the two occupants of the vehicle so they could be interviewed separately about the details of the trip. The mudguards were never mentioned nor checked. No warning ticket was discussed (or if it was, the record is silent as to any details) or issued. Both men were asked separately by Sgt. Chugg to consent to a search of the vehicle, which Tibbetts ultimately gave. Sgt. Chugg is apparently quite skilled in drug interdiction, but if he or other highway troopers are to use the opportunity of traffic stops in which to deploy their drug detection skills, they must at least give the *only* legitimate basis for being in the company of the motorist—that being a traffic violation—some reasonable attention. Otherwise, they risk, as is the case here, a finding that the stated

purpose of the stop was not the real purpose for the encounter.

It is true pretext law has been eliminated in the Tenth Circuit, (See *Whren v. U.S.*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)), but that did not eliminate in any way the requirement that the police officer must have a legitimate, traffic code related basis for making and continuing a traffic stop based on an alleged violation of the traffic laws. If, for example, a trooper sees a vehicle in which he suspects illegal drugs, and which is also in violation of the traffic code's requirement for working head lights, the trooper may legitimately require the operator of the vehicle to pull over to the side of the road based on the headlight violation. During the processing of the traffic matter, the trooper may, under certain well defined parameters, become aware of further evidence of drug trafficking. But, absent unusual circumstances that are not present in the instant case, the trooper cannot virtually ignore the headlight violation that gave him the only legitimate basis for effecting the traffic stop in the first place. That is what has occurred in this matter, leaving the Court with no alternative but to conclude that the stop was not for a legitimate traffic related purpose, but for the purpose of conducting a drug investigation. Defendant Tibbetts' Motion to Suppress is GRANTED.

IT IS SO ORDERED.

---

**4.** See *Botero–Ospina,* 71 F.3d at 787.