Brandon J. Harrison, Judge, dissenting.
I respectfully dissent from the majority's decision to affirm the denial of the motion to suppress. The initial traffic stop was unlawful given this case's facts, so the circuit court should have granted the motion. Given my disagreement with the majority on the lawfulness of the traffic stop and the suppression question, I do not need to decide the sentencing-enhancement challenge.
I.
State's exhibit A-the ACIC verification from Officer Hoegh's investigation into Small's lawfully displayed and registered license plate-shows that "PLATE/018TJG" was searched the evening of 12 February 2016. The report lists Small as the vehicle owner and a Fort Smith resident. The second page has a section titled "INSURANCE INFORMATION." Here is what it looks like:
As one can see, the information the officer obtained when he stopped Small was more than one year out of date. The "END DATE" of the policy, as reported by the database, was 4 January 2015. Small was detained in mid-February 2016, on the suspicion of driving uninsured, though he was in fact insured. The report does state that a certain insurance policy was cancelled; yet it also warns, "VALID INSURANCE POLICIES MAY EXIST THAT ARE NOT INCLUDED IN THE DATABASE AT THIS TIME." As this case exemplifies, the blanket disclaimer is wholly justified.
During the suppression hearing the officer said that he did not know about the disclaimer. But he also acknowledged, "[I]t has happened before that I stopped someone for no insurance and they had insurance." The police department "typically look[s] at the information they provide with the expiration date, the effective date and the expiration date, who it's with." And the officer said at times he has called an insurance company to validate someone's policy. The State offered no additional proof on the database's operation or accuracy.
Now is as good a time as any to note that the State's position on appeal does not appear to be what it was in the circuit court. Nowhere in the State's circuit-court papers does it cite any of the statutes on which the State's appellate brief and the majority opinion rely. Nor did the State expressly argue this case as one where the officer had "probable cause" to detain Small based on an unobserved traffic-law violation. In circuit court, the State argued that the stop was valid under Arkansas Rules of Criminal Procedure 2.2 and 3.1. The court ruled, "Officer Hoegh ran the Defendant's plate and showed to have canceled *524 insurance, which provided reasonable suspicion for a stop of the vehicle." Rule 3.1 states:
A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct.
The State does not now contend that a report from the insurance-coverage database provides reasonable suspicion that a felony or a misdemeanor involving danger of forcible injury to a person or a theft or that some property damage occurred. It changed tack on appeal, moving the case from Rule 3.1's "reasonable suspicion" and "felony and misdemeanor" concepts to "probable cause" and "traffic violation" concepts. The majority has accepted the State's new argument that an officer's discretionary decision to search the shaky database-having no observable and articulable reason to do so in the first place-supplied the officer with (1) probable cause that a (2) traffic violation had occurred under Ark. Code Ann. § 27-22-104. So I too will address this issue of first impression.
II.
Section 27-14-414 of the Arkansas Code, titled "Vehicle Insurance Database," charged the Department of Finance and Administration to "develop, establish, and maintain a database of information to verify compliance with the motor vehicle liability insurance laws of Arkansas[.]" Ark. Code Ann. § 27-14-414(a) (Repl. 2014). The statute plainly recites that "state and local law enforcement agencies can access the [database] to check the current insurance coverage on motor vehicles in Arkansas required to maintain current liability insurance as required by law." Ark. Code Ann. § 27-14-414(b)(2) ; see also Ark. Code Ann. § 27-14-414(e)(1)(C). But the way law-enforcement officers can employ the Vehicle Insurance Database is partly constrained by the United States Constitution.
The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court of the United States has held that temporarily detaining a person during a traffic stop is a "seizure" of "persons" within the meaning of the Fourth Amendment. Delaware v. Prouse , 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). A police officer's decision to stop a person while traveling in a motor vehicle is therefore subject to the "constitutional imperative" that the stop not be "unreasonable" under the circumstances. Whren v. United States , 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).
Was the officer's decision to pull Small over and detain him reasonable given the circumstances? Generally, the answer turns on whether the officer had probable cause to believe that a traffic violation has occurred. See Prouse , 440 U.S. at 659, 99 S.Ct. 1391. Though it cannot be defined as definitively as E=mc[2], identifying some parameters on the core concept of probable cause is worth the time in this Fourth Amendment case. Here is the Supreme Court on probable cause:
Articulating precisely what "reasonable suspicion" and "probable cause" mean is not possible. They are commonsense, nontechnical conceptions that deal with *525 the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. As such, the standards are not readily, or even usefully, reduced to a neat set of legal rules. We have described reasonable suspicion simply as a particularized and objective basis for suspecting the person stopped of criminal activity, and probable cause to search as existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found. We have cautioned that these two legal principles are not finely-tuned standards, comparable to the standards of proof beyond a reasonable doubt or of proof by a preponderance of the evidence. They are instead fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed.
The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause. The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: The historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.
Ornelas v. United States , 517 U.S. 690, 695-97, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (internal quotations and citations omitted).
And it is important to realize that police/citizen encounters, even if brief in duration and for the purpose of ensuring compliance with motor-vehicle laws, are significant events. Here is the Supreme Court making this point:
We cannot assume that the physical and psychological intrusion visited upon the occupants of a vehicle by a random stop to check documents is of any less moment than that occasioned by a stop by border agents on roving patrol. Both of these stops generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority. Both interfere with freedom of movement, are inconvenient, and consume time. Both may create substantial anxiety. For Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random stops of individual vehicles making their way through city traffic and those stops occasioned by roadblocks where all vehicles are brought to a halt or to a near halt, and all are subjected to a show of the police power of the community. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.
Prouse , 440 U.S. at 657, 99 S.Ct. 1391 (internal quotations and citations omitted).
The State of Arkansas has not identified any behavior by Small, that the officer himself observed or heard, which supplied the probable cause required to initiate a traffic stop. There is no contention that Small was not wearing his seat belt, that he failed to use a turn signal, that he was speeding, driving carelessly, or committing any number of additional potential violations that could justify a stop. Under Arkansas *526 law, a properly registered vehicle presumes a sufficiently insured vehicle. See Ark. Code Ann. § 27-13-102(a) (Repl. 2014) (motor-vehicle license plate or registration shall not be issued, renewed, or changed unless proof of liability insurance is given). By all accounts Small's license plate had no obvious defect; it was present, visible, and the registration stickers were current. Small should have been presumed compliant with Arkansas law. So why run an insurance check under circumstances that did not "warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found"? Ornelas , 517 U.S. at 696, 116 S.Ct. 1657.
The officer had to, when we get right down to it, guess on the result the insurance investigation would return. One could argue, "Your license plate is public and therefore you have no expectation of privacy in it." But a driver's mere presence on the road is even more obvious, and that fact alone does not authorize a police officer to stop a motorist and demand that he or she produce a license and proof of registration, for example. The Supreme Court of the United States so held in Prouse, supra. In this case, nothing observable to the officer's trained eye provided probable cause or reasonable suspicion for the seizure of Small's person.
As for the database, the State has offered no statistical evidence on its accuracy. Is the database 98% accurate? Or 98% in accurate? No one knows anything, really, about its overall accuracy, and that uncertainty is a rub of constitutional magnitude. As previously mentioned, the officer testified during the suppression hearing that he has pulled people over when the database reported that a driver's insurance was expired or revoked and it was not. His testimony bolsters what the database itself expressly declares: it is an unreliable source of insurance-coverage information.
The accuracy of a primary source of information on which police officers might base an unknown number of probable-cause decisions to detain the traveling public on the suspicion of driving without insurance is a critical concern. It must be. Constitutional rights hang in the balance. The Supreme Court has stated that the likelihood of discovering a violation during a discretionary stop is an important variable in the constitutional calculus.
In terms of actually discovering unlicensed drivers or deterring them from driving, the spot check does not appear sufficiently productive to qualify as a reasonable law enforcement practice under the Fourth Amendment.
Much the same can be said about the safety aspects of automobiles as distinguished from drivers. Many violations of minimum vehicle-safety requirements are observable, and something can be done about them by the observing officer, directly and immediately. Furthermore, in Delaware, as elsewhere, vehicles must carry and display current license plates, which themselves evidence that the vehicle is properly registered; and, under Delaware law, to qualify for annual registration a vehicle must pass the annual safety inspection and be properly insured. It does not appear, therefore, that a stop of a Delaware-registered vehicle is necessary in order to ascertain compliance with the State's registration requirements[.]
Prouse , 440 U.S. at 660, 99 S.Ct. 1391.
The State's omnipresent interest in promoting public safety on Arkansas's roads by enforcing compulsory insurance laws must be weighed against Arkansans' right to remain free from police officers' unbridled discretion. Checkpoints are potentially *527 lawful means to enforce insurance-coverage concerns, when proper procedures are in place. But even organized checkpoints have some restrictions. In Whalen v. State , for example, our supreme court held that evidence obtained during a checkpoint stop had to be suppressed because the checkpoint procedure did not sufficiently constrain officer discretion on whom to detain: "A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasion solely at the unfettered discretion of officers in the field." 2016 Ark. 343, at 6, 500 S.W.3d 710, 713 (internal citations omitted). This case did not involve a checkpoint, but the principle at work is the same: well-intentioned though he may have been, the officer in this case made an unfettered discretionary decision to stop a citizen who had done nothing obviously unlawful in his conduct and whose vehicle was observably compliant with the motor-vehicle laws.
As hard as I have tried to do so, I cannot bring my mind to conclude that a database used for law-enforcement purposes-whose accuracy (or inaccuracy) is wholly unknown to any number of officers at any given point in time-provides a fact "sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found" when all the other observable facts right in front of an officer speak the contrary. Ornelas , 517 U.S. at 695-96, 116 S.Ct. 1657.
The Supreme Court of the United States deserves the final word on the reasonable expectation of privacy that all Americans enjoy while operating or traveling in an automobile:
An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation. Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As Terry v. Ohio , [392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ], recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles.
Prouse , 440 U.S. at 662-63, 99 S.Ct. 1391.
III.
The State infringed on the reasonable expectation of privacy that Jake Earl Small was entitled to receive under the Fourth Amendment to the United States Constitution while driving his car on 12 February 2016. I therefore respectfully dissent from this court's decision to affirm the denial of the motion to suppress evidence obtained during the illegal traffic stop.
Vaught, J., joins.